ANNA E. WOLF *v.* DANIEL WOLF, her husband.—PRICE, WALSH & CO., Third Opponents.

Although there can be no sale without a price in money, it does not necessarily follow that the act is void because it wants this requisite of a sale; if there be no just cause for declaring it null, it may exist in another form as an exchange, a donation or a pledge.

The vendor himself is not permitted to question the sale he has made, unless he has reserved a counter-letter, or relies on the answers of his adversary to interrogatories on facts and articles.

Neither can any third party question the same without showing not only that it is simulated or fraudulent, but that it is also injurious to such third person who complains of it.

There is nothing immoral in using the contract of sale as security for money advanced or to be advanced.

The title of owner, under such a contract, must necessarily embrace that of pledge, and enable a party clothed with the legal title to protect himself for advances, on the expectation of which the sale was made.

A pledge, as well as a mortgage, may be made to secure an obligation not yet risen into existence.

APPEAL from the Fifth District Court of New Orleans, *Augustin*, J.

*M. Grivot* and *C. Roselius*, for plaintiff and appellant. *Wolf & Singleton*, for appellees.

MERRICK, C. J. This case will be best understood by a statement of facts in the order in which they occurred.

On the 29th day of June, 1855, *Daniel Wolf*, by an act executed in the presence of two witnesses and a notary public, made a formal act of sale of a house and certain lots, and certain other real estate in the city of New Orleans, to *Price, Walsh & Co.*, for the nominal sum of $10,000, acknowledged in the act to have been paid. The plaintiff, *Anna E. Wolf*, made herself a party to the act of sale and renounced in favor of the purchaser her tacit mortgages and privileges.

On the second day of July, the said *Daniel Wolf* sold to the same vendees, by another notarial act, a negro woman and certain household furniture, and a carriage and horses, for the ostensible sum of $4212. The wife also signed the act renouncing, as in the former instance. The property purported to be sold belonged to the community existing between *Wolf* and wife.

On the first day of October, 1855, *D. Wolf & Co.* owed *Price, Walsh & Co.* $14,029 92, and on the 30th of the same month, they owed $21,757 64. This amount appears to have been subsequently increased by the payment by *Price, Walsh & Co.* of certain bills due to the vendors to *D. Wolf* of the furniture. *Wolf*, who traded in Mexico, left the house where he resided, which was on one or more of the lots sold to *Price, Walsh & Co.*, on the fifth day of July, 1855, taking his wife with him. *Mrs. Wolf* returned on the 19th of October, and then removed from that place to the Florence House.

When *Wolf* left for Texas, *Samuel Lockhart* had charge of the house and furniture for him. *Lockhart* subsequently, on being informed that the property belonged to *Price, Walsh & Co.*, received his wages from and held the property for them.

On the 13th day of February, 1856, *Anna E. Wolf* instituted a suit for a divorce against her husband, and joined *Price, Walsh & Co.* as co-defendants, alleging that said acts of sale were null and void, and were never intended as a *bona fide* sale, no value having been received for the same. She prayed that

67

WOLF
v.
WOLF.

*Price, Walsh & Co.* "be made parties to test the validity of the two acts of sale."

The court having made an order allowing the plaintiff one hundred and fifty dollars a month alimony, on the 24th day of March, 1856, she issued an execution under which she caused to be seized "all the goods, chattels, lands, tenements, rights, credits, bills of exchange and promissory notes and property of every kind whatsoever *in the hands of Price, Walsh & Co.*," and propounded interrogatories to them on facts and articles, on the third day of April, 1856.

On the 16th day of April, *Price, Walsh & Co.* answered the interrogatories, in which they denied being indebted to *Daniel Wolf*, but on the contrary answer that *Wolf* was indebted to them in a sum of over $20,000, and that they are upon his paper for over $30,000 more; that they refused to make these advances for *Wolf*, unless he would make an absolute sale of his property, specified in the two acts of sale to them, that the sale was made in order to secure them any advance they might make; that as soon as *Wolf* shall pay them the money they have advanced, a portion of which was advanced to pay notes secured by the vendor's privilege on some of the property contained in the acts of sale, they will re-transfer said property to said *Wolf*; but until that is done, they hold it as security for their advances, and that they suppose the property worth not over $10,000, if it is worth that much.

After the filing of the answers to the interrogatories, a new *fieri facias* issued for the succeeding instalment of alimony, and on the third day of May the Sheriff seized, under the first writ, the household furniture sold to *Price, Walsh & Co.*, then on the premises sold them, and in the custody of *Samuel Lockhart*, as their agent. On the 22d day of May, *Price, Walsh & Co.* intervened as third opponents, claiming the proceeds of the sale. The furniture brought, after deducting costs, $1054.

The matter in controversy is the right to this fund. The Judge of the lower court awarded it to *Price, Walsh & Co.*, and the plaintiff appealed.

The only question of fact in the case, about which the parties differ, is as to who had possession of the movables at the time the seizure was made.

We think *Price, Walsh & Co.* must be considered as the possessors of the personal as well as real property, for the following reasons:

1st. They bought by notarial act, which *prima facie* gave them the possession of the real estate, and the movables were in their house. C. C. 2455.

2d. *Samuel Lockhart* says expressly, that at the time of the seizure of the property, he was keeping it for *Price, Walsh & Co.* His language is: "When the Sheriff seized the property, I was keeping it for *Price, Walsh & Co.*"

The plaintiff considered the property in the possession of *Price, Walsh & Co.* when she brought her suit to "test the sale" and when she propounded the interrogatories to them, their answers confirming such possession.

The appellants raise the following questions of law in this case. They maintain:

1st. That the pretended sale of the property by *Daniel Wolf* to *Price, Walsh & Co.*, was a mere simulation; no price was paid, nor is it pretended that any price was agreed upon.

2d. That *Price, Walsh & Co.* have no privilege, for in the first place they have no act of pledge, and in the second place, even if the simulated act of sale could be considered as a diguised act of pledge, it is null and void for want

of actual delivery, possession being the essence of the contract, and also because there was no existing principal obligation to which the contract of pledge could attach.

3d. That the renunciation of the mortgage by the wife produced no effect.

We have already said that we think that *Price, Walsh & Co.* had the possession of the property at the time of the seizure. We will consider the legal objections with reference to this fact.

I. It is true there can be no sale without a price in money, but it does not necessarily follow that an act is void because it wants one of the essential requisites of a sale. If there is no just cause of declaring it null, it may exist in another form, as an exchange, a donation, or pledge. *Rhodes* v. *Rhodes*, 10 L. R. 85; *Williams et al.* v. *Sch. St. Stephen*, 1 N. S. 417; 2 N. S. 22; 2 Rob. 101. But as the vendor himself is not permitted to question the sale which he has made, unless he has reserved a counter-letter or interrogates his adversary under oath on facts and articles, so also can no third party question the same without showing both that it is not only simulated or fraudulent, but that it is also injurious to the party complaining. 1 N. S. 166; 2 Rob. 94; 18 L. R. 388. Neither does it follow, because parties have clothed their contract in one form instead of another, that it will not avail in either. There is no such penalty declared by the law-giver, and the courts cannot supply it. Then is there anything immoral in using the contract of sale as the security of money advanced or to be advanced in good faith? We think not. The Civil Code has itself traced certain provisions of law in regard to sales with a power of redemption. See Art. 2545 *et seq.* If the vendor chooses to trust so much to the vendee as to make him a sale of the property without any security for the price, we know no law to prevent him. As he may make an absolute donation of his property, saving the rights of parties injured, we see no reason to declare an act void because the vendor has contented himself with a false cause, a fictitious price, instead of inserting the true cause of the contract. C. C. 1894. The act, therefore, on which *Price, Walsh & Co.* rely, being clothed in the form of a sale, they stand before us *prima facie* as possessing the highest title to the property known to our law, viz, as absolute owners of the entire thing with all its accessories.

II. It is true that *Price, Walsh & Co.* have no act of pledge *eo nomine;* nevertheless, as has just been observed, they have the absolute ownership of the thing, the *dominium* which includes the *jura in re.* Their higher title of owner will enable them to hold so much of the thing or its price as is due them, against any person who seeks to deprive them of the same by an inferior title. 1 N. S. 417. The title of owner must necessarily embrace that of pledge, as the pledgor can dismember or carve this lesser interest out of his right, and still have a right existing in the thing, as against the pledgee. Mackeldey book 1, No. 239, P. Speciale. But it is said there was no existing principal obligation to which the pledge can attach as accessory. When *Daniel Wolf* conveyed this property to *Price, Walsh & Co.*, nothing remained in abeyance. The property became (so far as all the world was concerned) the property of *Price, Walsh & Co.* If they had sold it to a *bona fide* purchaser, he would have held it; if they had mortgaged or pledged it, the mortgage or pledge would have been good. Clothed as they were with the legal title, there was nothing which prevented them from continuing so to hold to protect themselves for the advances made by them, on the expectation of which the sale was made.

WOLF
*v.*
WOLF.

A mortgage may be made to secure an obligation not yet risen into existence, and we find no principle of law which prevents a pledge being made for the same purpose. 3259, 3251 C. C. We think, therefore, that in the present instance, *Price, Walsh & Co.* may be considered as possessing under their absolute title as pledgees of the property, and that the proceeds must first be applied to the extinguishment of their debt before it can be applied to the execution of the wife, considered as a third person.

III. As the husband is the head and master of the community, and as he had the power to pledge or sell the effects of the community, or even donate the movables by particular title, without the assent of the wife, we have considered the case without reference to the renunciation of the wife made in the two acts of sale. C. C. 2373.

Inasmuch as *Price, Walsh & Co.* have, as just observed, a better title to the proceeds of the property, in virtue of the acts of sale in their favor, than has the plaintiff under her garnishment and seizure, the judgment of the lower court must be affirmed.

Judgment affirmed.

SPOFFORD, J., dissenting. *Price, Walsh & Co.*, third opponents, claim a privilege upon the proceeds of certain furniture, which has been seized and sold under execution upon a judgment obtained by *Anna E. Wolf* v. *Daniel Wolf.*

The sole question then is, did *Price, Walsh & Co.* have a privilege upon the seized furniture at the date of the seizure? and, *quoad* this question, they are plaintiffs and must prove their case.

To say that they were *owners* of the furniture, would be to contradict their own allegations and to give them more than they ask. By submitting to the seizure and sale, by claiming a privilege on the proceeds, and by the whole tenor of their opposition, they have admitted, and are concluded by the admission, that the furniture was the property of the seized debtor.

Now, have the opponents a privilege? Privileges are *stricti juris*, and exist only in cases for which our law has made express provisions, and then only by virtue of an exact compliance with the requisites of the law to create a privilege.

The only modes by which the opponents pretend to have acquired a privilege, are two: first, by paying the vendors who sold the furniture to *Wolf*, and thus becoming subrogated to the vendors' lien, and, secondly, by pledge.

On the first point, there is no proof to authorize for a moment the inference of a subrogation to the vendors' privilege.

On the second, the proof is far from satisfactory. There is no act of pledge. The act of sale proves nothing, for it is acknowledged to be a sham. The answers of *Price* to the garnishment, which he offered in evidence on the opposition, do not, in my opinion, establish a valid contract of pawn. They prove no definite principal obligation, which is essential to support the auxiliary contract. They establish no delivery of the furniture. The witness *Lockhart* does not, to my mind, prove any delivery of the furniture to *Price, Walsh & Co.* All his testimony must be considered together, and, so considered, fails to show such a tradition as is essential to constitute a pawn.

My impression is, that the judgment should be reversed and the opposition dismissed.

VOORHIES, J., concurring.