## No. 181.—H. WARE & SON *v.* A. P. MORRIS.

To constitute a sale there must be a consent to sell, that is, the vendor's volition to sell and the vendee's to buy must concur.

A document in the form of a sale, but shown by a counter letter to have been executed with no intention either on the part of one party to buy or of the other to sell, can not be a contract of sale.

It may be lawful to secure a debt by an instrument in the form of a contract of sale, but such an instrument is not in reality an act of sale, but of pledge or hypothecation.

Where such an hypothecary right merely exists, an action by the pretended vendee for the land can not be maintained, nor will the pretended vendor be estopped from showing the merely hypothecary character of the contract by the fact that he had gone into bankruptcy without surrendering the land on which the right had been granted.

APPEAL from the Fourteenth Judicial District Court, parish of Morehouse. *Ray, J. Newton & Hall*, for plaintiffs and appellants. *S. G. Parsons* and *D. C. Morgan*, for defendant and appellee.

WYLY, J. On the sixth day of April, 1867, the plaintiffs and the defendant made a contract in the form of a sale, in which, for the price of two thousand dollars, the defendant conveyed to the plaintiffs the plantation described in the petition, together "with all the crops, stock, mules, horses, agricultural implements and all the buildings and improvements thereon." On the same day they executed and signed the following counter letter, explaining the true intent and real object of said contract, to wit:

" This agreement, made and entered into this sixth day of April, 1867, between Allen P. Morris, of the parish of Morehouse, State of Louisiana, of the first part, and Henry Ware & Son, a commercial firm of the city of New Orleans, State of Louisiana, of the second part witnesseth : That whereas the said A. P. Morris has this day drawn a draft on the said H. Ware & Son dated this day and payable to his own order on the first day of January, 1868, for the sum of twenty-two hundred and thirty dollars, and as security for the payment thereof has given to said H. Ware & Son a deed of certain land, by act passed before E. G. Wells, notary public for the city and parish of New Orleans. Now, this private agreement is made between the parties hereto of the first part and second part, viz : The said parties of the second part are to accept the said draft of two thousand two hundred and thirty dollars and are also to discount the same or procure it to be discounted, for which they are to be allowed and are to receive a commission of five per cent. and interest at the rate of eight per cent. per annum, and are to place the net proceeds of said draft to the credit of said A. P. Morris on their books, subject to his order, and on the payment of said draft by said party of the first part, with interest after maturity at the rate of eight per cent. per annum, and the fulfillment of the obligations hereinafter entered into by the party of the first part, then the said parties of the second part are to reconvey to said A. P. Morris the land so sold by him to said parties of the second part,

84

without further payment by him, the party of the first part, except the payment of drawing the necessary papers therefor and of the United States internal revenue stamps to be placed thereon; and the said party of the first part hereby binds and obligates himself to ship or cause to be shipped to said H. Ware & Son all the cotton raised during the current year on the two plantations in the parish of Morehouse known as the Rimes and Otterson places, which he is cultivating in connection with J. B. Nott and M. A. Bray, to be sold by said H. Ware & Son on commissions; and if the cotton so shipped during the current year does not amount to two hundred bales, then he is to allow to said H. Ware & Son commissions which, with the commissions on that which he does so ship, shall amount to a sum equal to what the com-. missions would be on two hundred bales of cotton, estimating four hundred and fifty pounds per bale and the price at the price at which middling cotton may be sold or quoted at in New Orleans on the first day of January, 1868, and the commissions to be two and one-half per cent. on that amount.

"In witness whereof the said parties have hereunto set their hands and seals the day and year first above written.

[L. s.]                  "A. P. MORRIS,

[L. s.]                  "H. WARE & SON,

"By H. WARE."

Under the contract, as explained by the counter letter, the possession of the property continued in the defendant, Morris. The plaintiffs now bring this petitory action for the property and aver that they are the *bona fide* owners thereof by virtue of the said deed of the sixth day of April, 1867; they also claim the rent thereof from 1867, which is admitted to be worth one thousand dollars per annum.

The defendant pleaded the general denial and averred that no real contract of sale was executed by him to the plaintiffs; that the act purporting to be a deed of conveyance was not intended to divest him of the ownership of the property, but was executed merely as security for a certain draft drawn by the defendant for $2230, which the plaintiffs were to accept and discount and place the proceeds to his credit, they being his commission merchants; that the parties did not consider said contract a sale, but simply as evidencing a hypothecary right to secure the advances to be made by the plaintiffs to enable him to carry on his plantation and raise a crop of cotton, which was to be shipped to them and sold on commission.

The court rejected the demand of the plaintiffs, and they have appealed.

Looking to the "private agreement" or counter letter to see the true purpose of the parties, we have no difficulty in determining that there was no sale of the property described in the petition. If effect

be given to the recitals and stipulations of that instrument, the idea of a sale is utterly precluded. If Morris was selling his land and mules and stock and plantation implements, as the deed purports, in order to raise $2000 to buy plantation supplies, what was the use of drawing the draft maturing on the first day of January, 1868, to be accepted by H. Ware & Son at the expense of five per cent. commissions and to be discounted at a further expense and the proceeds placed to his credit? Why raise money on such exorbitant terms? Why incur these heavy charges and also bind himself to ship all his crops and guarantee H. Ware & Son in two and a half per cent. commissions to be derived from the proceeds of at least two hundred bales, whether he raised that number or not? Why pay three hundred dollars in commissions and discount, and also bind himself to give them commissions on $20,000 worth of cotton, merely to get $2000 in supplies, when that was already his, received as the price of the sale? Would a sensible or reasonable man sell property the rent of which is admitted to be worth $1000 per annum for the paltry sum of $2000, and then, in order to get the price, submit to discount and commissions amounting to $800 in the aggregate?

What was the situation of Morris on the hypothesis of a sale? He was bound as drawer of the draft which he gave H. Ware & Son five per cent. commission to accept, and he had neither land, mules, horses, stock, farming implements—none of the property described in the act of sale of the sixth of April, 1867. Assuming there was a sale what effect can be given to that clause of the counter letter which declares' "that whereas the said A. P. Morris has this day drawn a draft on the said H. Ware & Son, dated this day and payable to his own order on the first day of January, 1868, for the sum of two thousand two hundred and thirty dollars, and as security for the payment thereof has given to said H. Ware & Son a deed," etc?

If the proceeds of the draft to be accepted and discounted were intended to be given to Morris as the price of his property, where was any debt to be secured?

If Morris continued to owe the debt which the counter letter says was intended to be secured, there was no sale. The seller gets the price and owes the buyer nothing for giving it to him. The property conveyed is deemed the equivalent for the price. Looking to the counter letter to learn the real purpose of the parties, we do not see their consent to make a sale; there was not the concurrence of the seller's will to sell and the buyer's to buy a particular thing for a particular price. There can be no contract of sale where it appears, as in the counter letter before us, that the intention of the parties was neither to buy nor to sell, but rather to disguise another contract under the false appearance of the contract of sale. Pothier on Sale, paragraphs 31, 38.

We had occasion to examine this subject very fully in the case of Calderwood *v.* Calderwood, lately decided, where there was disguised under the form of sale a contract of pledge or antichresis, which was discovered only in the counter letter.

Here a hypothecary right is given under the false appearance of a contract of sale, possession being retained by the ostensible vendor.

No doubt it is lawful to secure a debt under an apparent act of sale, but it is nevertheless a pledge or hypothecary right which really subsists between the parties, concealed, however, behind the false appearance of the contract of sale. In such a case the title never passes; the real contract may be a pledge or a mortgage—the apparent one a sale.

The reason a mortgage or pledge may be good under the form of a sale is, the latter combines all the rights of perfect ownership, and this necessarily embraces hypothecary rights of every description, and also possession. As every right appertaining to the thing is conveyed in the contract of sale, there is no reason why the conveyance of the hypothecary right embraced in that instrument should be lost, merely because it is made to appear that the owner did not intend to pass the other rights of property accompanying it in the act of sale. Wolf *v.* Wolf, 12 An. 529.

The real character and effect of a contract is determined from its constituent elements, and where it appears that the intention of the parties was not to sell nor to buy, as in the case before us, but merely to secure a time draft which the planter had given to his commission merchant to be discounted and the proceeds placed to his credit, by granting an hypothecary right upon his plantation, the contract amounts to a mortgage notwithstanding it is clothed in the form of a sale

The character of the contract in this case is easily determined from the counter letter, where the real purpose of the parties is expressed. Between the parties the counter letter is as operative as if its recitals and stipulations had been expressed in the notarial act. We apprehend that if such had been done this suit would never have been instituted; the purpose and object of the contract would have been too apparent for doubt.

But the plaintiffs contend that the defendant is estopped from disputing their title to the property in controversy because, when subsequently becoming embarrassed and surrendering his property in bankruptcy, he did not surrender the property in dispute, and declared that he had disposed of it; that this amounts to a judicial admission that they are the owners thereof.

This is carrying the doctrine of estoppel too far, we apprehend. The moment the decree of bankruptcy is declared the bankrupt ceases to

have the right of disposition or to possess proprietary rights in the property belonging to him at that time. Even sales made by the bankrupt within four months of his bankruptcy are often avoided. Now if the plaintiffs were creditors of the defendant, with hypothecary rights upon the property in dispute, at the time he was declared a bankrupt, *no act of his could defeat his creditors in the bankrupt court. Even if he had designed it, he could not have conferred any greater rights upon the plaintiffs than they already possessed. It was not in his power to do so.*

If he was false to his oath, withholding the property in controversy from his bilan, and declaring he had disposed of it, it was the duty of the plaintiffs, as honest men, knowing its true situation, to step forward and disclose its true condition. They ought to have caused this valuable property, the rent of which is admitted to be worth $1000 per annum, to be placed on the schedule of the bankrupt, and ask for the two thousand dollars due them out of its proceeds. This was due to the other creditors who knew not of the counter letter, and it was also due to the plaintiffs themselves as honest men.

We have seen that the contract of the sixth day of April, 1867, did not divest the defendant of the ownership of the property, although it gave the plaintiffs an hypothecary right thereon to secure the payment of the draft which they accepted for him. Will it require serious argument to prove that the *acts and declarations* of a bankrupt can not divest him or his creditors of the property which he owns at the time he files his schedule in bankruptcy? Surely not. If the surrender was the civil death of the bankrupt as to the property he owned at the time, fixing the status of his creditors in relation to his estate, surely no act of his thereafter could affect the succession or give creditors preferences or mortgage rights which they did not possess before it was opened. The rights of his creditors were as thoroughly fixed by *this civil death as if it had been the natural death of the defendant.*

We think the plaintiffs come with bad grace to claim, under their contract with the defendant, property yielding an annual revenue of one thousand for the paltry sum of two thousand dollars, or for merely indorsing his draft for that amount; and also that their title is not enhanced by the perjury and attempted fraud, if such there be, of the defendant while partaking of the advantages of the bankrupt act and seeking its relief from his embarrassments.

In Collins *v.* Pellerin, 5 An. 99, where certain cotton presses were sold by the defendant to the plaintiff for $1500, and possession retained by the vendor, it was held not to be a sale, because the counter letter showed that the act of sale was executed merely to secure the loan of $1500 made by Pellerin to Collins for twelve months from date, and on the default of the return of the money by the borrower within that period the sale was to be absolute and irrevokable.

In that case, involving the same principle, springing from a state of facts almost identical with the one before us, Chief Justice Eustis, as the organ of the court, remarked: "It is clear to us that the contract between the parties was not a sale with the power of redemption, but merely an hypothecary action. The sum of $1500, we think the evi-dence shows, was far less than the value of the objects, and the circumstance of the vendor's remaining in possession we consider as a distinctive sign of the real nature of the contract. The want of delivery of the thing sold by the vendor is held by civilians to be a badge of simulation, and as depriving the contract of the essential characteristics of a sale. Redeemable sales, unaccompanied by deliv-ery of the thing sold, of which the considerations are inadequate, courts are bound to consider, without sufficient evidence to the contrary, *as contracts for which the thing nominally sold stands as security and noth-ing else.*"

The contents of the counter letter we think authorize the conclusions. of the district judge.

Judgment affirmed.

___

HOWELL, J., *concurring.* I concur with Mr. Justice Wyly that the act of sale and counter letter, construed together, do not constitute and were not intended by the parties to be an actual sale, but merely to-secure the rights and interests of plaintiffs as the merchants and fac-tors of defendant. The only difficulty in the case grows out of the defendant's admission on the trial that he did not place the property in controversy on his schedule in bankruptcy because he had disposed of it to the plaintiffs.

The record shows that he made his surrender after the institution of this suit, and it may be that he considered that under article 2453 R. C. C., which says "the thing claimed as the property of the claimant can not be alienated pending the action so as to prejudice his right," he was not authorized or justified in placing this property on his schedule, and that as the State court had jurisdiction of the question of its title, it should there be settled. Be this as it may, I can not say that, under all the circumstances, the admission in the evidence (and not in the pleadings) is such an estoppel as will conclude his right to-make the defense set up in this case.

The admission, as contained in the record, is not necessarily an admission of a sale, and if a construction can be placed on it other-than such as must convict him of fraud, such a construction should be adopted, as fraud is not presumed. The words "disposed of" may only have been used by him to mean such a disposition as shown in the pleadings herein, and to be settled in this suit.

The counter letter explains the disposition made of the property,.

and we are not informed what report he made of it to the bankrupt court. What may be the effect, as to creditors, of his failure to place this property on his schedule, and what his duty was in making his surrender, are questions, in my opinion, not before this tribunal.

---

HOWE, J., *concurring*. It is sometimes said that a sale may be made to secure a debt. I think the expression inexact. A contract in the form of a sale may be so made, but it is not a sale. It is an hypothecation of some sort, defined or innominate.

I concur in the decree affirming the judgment of the lower court.

---

LUDELING, C. J., *dissenting*. The plaintiffs sue for a tract of land, and produce as the muniment of their title a notarial act of sale, perfect in form. The defendant denies that a real contract of sale was made, and that it was never intended to divest the title of defendant by said act of sale. And my learned brothers assuming this to be true, hold that there was no sale for the want of consent. I say with due respect that they assume that the parties did not intend a sale, for, in my judgment, the record flatly contradicts the statement. In the notarial act of sale it is recited "that for and on the terms and conditions hereinafter set forth and expressed, he (A. P. Morris) does by these presents grant, bargain, sell, convey and assign, set over and deliver, with full warrantee, * * * unto H. Ware & Son * * * the following described property," etc. The deed further recites that "said vendor declares that he is married, and that his wife is absent from the city of New Orleans; nevertheless he hereby binds and obligates himself to furnish the formal and·legal renunciation of all her rights of dower in and to the herein conveyed property, within thirty days from the execution of these presents," etc. The act of renunciation was in due time passed, in which she renounced all rights to the property "conveyed."

In the counter letter it is recited that "as security for the payment of a draft for $2000," he "has given to said Ware & Son a deed of certain land by act passed before E. G. Wells, notary public for the city of New Orleans. Now, this private agreement is made between the parties of the first and second part, viz: The said parties of the second part are to accept the said draft of $2030, and are also to discount the same or procure it to be discounted, for which they are to be allowed and are allowed to receive a commission of five per centum and interest at the rate of eight per centum, and are to place the net proceeds of said draft to the credit of said Morris, on their books subject to his order, and on the payment of said draft by said party of the first part, with interest after maturity at the rate of eight per cent.

per annum, and the fulfillment of the obligations hereinafter entered into by the party of the first part, then the parties of the second part are to reconvey to the said A. P. Morris the land so sold by him to said parties of the second part, without further payment by the party of the first part, except the payment of the expenses of drawing the necessary papers," etc.

This language, to me, is as unambiguous as it is possible to make it. A. P. Morris sells the land for the price stipulated; it is immaterial whether that was the $2000 stipulated in the notarial act, or only the net proceeds of the draft accepted by Ware & Son and discounted, as stipulated in the counter letter, and the said vendor reserved to himself the right to redeem the property on the terms stipulated in the counter letter. Whether these obligations assumed by the vendor in the counter letter should be discharged or not, depended upon the choice of the vendor. They depended upon a potestative condition only, and Ware & Son could not have enforced them against the will of A. P. Morris. This was the contract made by the parties; it was the law unto themselves, and this court has not the right, though it has the power, to make a new contract for them. C. C. 1945. But if there be any ambiguity in the contract, construing the public and private acts together, the deed must be construed against the defendant, because it is only as a sale that the contract of the parties can have any legal effect.

"When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect, rather than in a sense which would render it nug.tory." C. C. 1951.

If it was not a sale it afforded no security to Ware & Son for the acceptance or advance of $2000.

It is not a mortgage, very surely, which is "a right granted to a creditor over property of the debtor for the security of his debt, and gives him the power of having the property seized and sold in default of payment. C. C. 3278, 3279, 3280. It is equally certain that it is not an antichresis, which is a pledge of real property. C. C. 3133, 3134, 3135.

The defendant's counsel call it an hypothecary right. I know of no such right except it flows from a mortgage, or, perhaps, the antichresis. But article 1956 of the Civil Code informs us that "when the intent of the parties is doubtful, the construction put upon it by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."

The record shows that the defendant did not pay the draft, nor did he ship his cotton as stipulated in the counter letter. But that he went into bankruptcy, and in that proceeding he admitted judicially and under oath that he did not own the property in question by not placing this property on the schedule of his property surrendered, and

Ware & Son v. Morris.

during the progress of the trial of the present suit he admitted that he had not surrendered this property in bankruptcy, "because he had previously disposed of it to the plaintiffs." Can there be a doubt after this that it was the intention of the vendor to sell and of the purchaser to buy the property? To do so we must suppose that the defendant perjured himself, when he gave in under oath a list of his property to the register in bankruptcy, and that he falsified the truth when he admitted that he had previously disposed of the property to the plaintiffs. It is the part of charity to believe his statements were true, and especially when the acts in question themselves corroborate his statements.

It is asked, why did Morris draw his draft for $2030, and agree to pay five per cent. per annum interest thereon, if the contract were a sale? The answer is obvious. Because he reserved the right to himself to redeem the property, and in that event he was to pay the draft with interest and commissions and perform the other obligations assumed in the counter letter. Because the bargain was a hard one for defendants, is no reason for us, in this suit, to abrogate it. There is no question of lesion or usury in this case, nor is there any question of the sanity of the defendant. The question is simply do the two acts already referred to constitute a sale or not? I have no doubt of it, and I know of no law which would authorize this court to annul it except for lesion, if that were proved, and proper pleadings and parties had been made for that purpose. "Judges should be astute in furtherance of right, and the means of recovering it." If the plaintiffs can not recover in this suit, I know of no means by which they can secure their debt. I therefore dissent.

TALIAFERRO, J. I concur in the dissenting opinion delivered by the Chief Justice in this case.