(81 South. 749)

No. 21518.

BUTLER v. MARSTON et al.

(March 31, 1919.    Rehearing Denied May 5, 1919.)

*(Syllabus by Editorial Staff.)*

1. MORTGAGES ⬦⟿33(5)—REAL REDEMPTION SALE.

Where a debtor, in consideration of a third person's arranging with the creditor to pay the debt, of something over $200, executed in favor of the third person a deed in the ordinary form purporting to convey his undivided interest in land for a recited consideration of $281.-23, and the third person agreed to reconvey, retaining mineral rights, if the debtor paid him $261.17 within 12 months, *held*, that there was a real redemption sale, and not a mere security.

2. MORTGAGES ⬦⟿33(5)—REDEEMABLE SALE—INADEQUATE CONSIDERATION—CONTRACT OF SECURITY.

. A redeemable sale, unaccompanied by delivery, and the price of which is inadequate, courts will consider without sufficient evidence to the contrary as a contract merely of security.

3. MORTGAGES ⬦⟿32(6)—REDEMPTION SALE—INADEQUACY OF PRICE.

In determining whether the price paid for conveyance of an undivided interest in land, with right in the seller to redeem within a year, was inadequate, the time when the value of the property must be judged is that when the buyer was considering whether to put his money on it, and not after it had acquired a value of $100,-000 as the result of a discovery of oil.

4. MORTGAGES ⬦⟿32(6)—REDEMPTION SALE—INADEQUACY OF PRICE.

Except as throwing light on what was probably the intention of the contracting parties, inadequacy of price is no more injurious to a redemption sale than to an out and out sale.

5. MORTGAGES ⬦⟿38(3)—REDEMPTION SALE—INADEQUACY OF PRICE—WEIGHT OF WRITINGS.

In determining whether the price paid on a redemption sale of land was inadequate, the writings which the parties have drawn up, though not absolutely conclusive or binding on the court, in the absence of all suspicion of undue advantage or cozenage are entitled to great weight.

6. MORTGAGES ⬦⟿33(5)—REDEMPTION SALE—GIVING EFFECT.

A redemption sale, if really such and. not a pignorative contract, must be given the effect of a redemption sale and not of such a contract.

O'Niell, J., dissenting from the conclusion of fact.

Appeal from Eleventh Judicial District Court, Parish of Red River; W. T. Cunningham, Judge.

Suit by Jim Butler against James G. Marston and others. From judgment for defendants, plaintiff appeals. Affirmed.

Scarborough & Carver, of Natchitoches, and Stephens & Raphiel, of Coushatta, for appellant.

J. C. Pugh & Son, of Shreveport, for appellees.

PROVOSTY, J. We will not attempt the vain task of improving upon the statement of this case contained in plaintiff's brief, which is as follows:

"Plaintiff and his two sisters owned 80 acres of land. Though undivided as to ownership, each enjoyed the exclusive use of a part of the property.

"Owing one Crawford something over $200, plaintiff arranged with J. G. Marston to pay same, executing in favor of Marston a deed in the ordinary form purporting to convey to Marston his undivided interest in the property for a recited consideration of $281.23.

"Contemporaneously Marston executed and delivered to plaintiff a counter letter in the following words and figures, to wit:

    "'Shreveport, La., February 11, 1913.

"'Jim Butler: I write to say that I have this day bought of you an undivided one-third (⅓) interest in the west half (W. ½) of the northwest quarter (N. W. ¼) of section 20,

township 13, range 10, for the recited consideration of $281.23. If you should pay this within twelve months of this date I agree to reconvey this land to you for $261.17, together with the taxes on said property, provided I retain the mineral rights on the property. If anything should happen so as to prevent my retaining a good and valid title to this property, and thereby lose the mineral right on it, then, in that event, you are to pay me the whole of the purchase price, $281.23.

"'Yours very truly,

"'[Signed]    J. G. Marston.'

"The purpose of this suit is to quiet plaintiff's possession of the property and to have it decreed that the transaction above mentioned was not a sale, but a mere security contract, so intended by both parties.

"Plaintiff alleges that the recited price was a vile one, the property at the time of the transaction being worth over $1,500.

"He further alleges that he kept possession of the property, rented it out for the years 1913 and 1914, and collected the rents, and that Marston never made any demand either for the rents or for possession of the property.

"He further alleges that he made improvements on the property to Marston's knowledge and without his objection.

"In the alternative, in case the contract be decreed a sale and not a security contract, plaintiff asks that it be decreed null and void for lesion beyond moiety.

"He further asks, in the event that Marston's intention was to acquire the oil and gas, that his effort in that regard be decreed null and void for the following reasons:

"(a) Lesion beyond moiety.

"(b) Because undiscovered oil and gas, being incapable of identification, are not subjects of sale under our law.

"(c) Because the terms used in the counter letter, namely, 'mineral right,' are too vague and indefinite to mean anything.

"(d) Because an attempted reservation of mineral rights could not extend to undiscovered minerals.

"(e) Because, as respects the attempted right of reservation, there was a potestative condition on the part of Marston; the counter letter not imposing any obligation on him to take the minerals, but purporting only to give him the option of doing so.

"Plaintiff also asks, in the event that a lease made by Marston to the Gulf Refining Company of Louisiana be decreed valid, that he have judgment against Marston for $1,666.66⅔, the share of the $5,000 bonus paid by that company accruing to plaintiff's one-third interest in the land.

"Defendant Marston admits . that he never demanded the rents or possession of the property from plaintiff or took possession himself, and also admits collection of the bonus from the refining company.

"The rest of his answer is practically a general denial, with a special denial that plaintiff retained possession, or that the price was inadequate.

"He affirms that the contract was intended to be a sale with right of redemption and that as such it was valid.

"By amended answer Marston claims the right of keeping the property on supplementing the price in case the court holds the sale void for lesion beyond moiety.

"J. W. Butler was made a party defendant, plaintiff asking as against him that an act executed a few days before the suit was filed purporting to be a conveyance to him by J. G. Marston of the property in question be decreed a fraudulent simulation.

"Marston and J. W. Butler both admit that this act was a simulation, and Marston conducts the defense; Butler, indeed, asking to be dismissed from the suit as without interest.

"John Marston and Ed. Lisso, as successors in title to plaintiff's sisters respecting oil and gas, were made parties defendant on the allegation that they had avowed a purpose to exploit the land for these minerals and that their acts in pursuance of this purpose were an interference with plaintiff's possession.

"They filed exceptions of no cause of action, based upon the theory that a co-owner had the right of exploitation, which exceptions were sustained by the court, and. the plaintiff acquiesced in this ruling.

"The Gulf Refining Company of Louisiana, which had leased 40 acres of the 80 from all the other defendants, was also made a party defendant.

"It filed an exception of no cause of action, which was overruled; but by agreement of all parties made on trial the suit was dismissed as to it on its agreement to deposit one-third of the royalties in bank, pending the litigation.

"Prior to bringing the suit, plaintiff had made an agreement with Scarborough & Carver and W. A. Warmsley, in which he had agreed that the former were to receive for attorney's fees four-tenths of the avails of the suit, and the latter, for furnishing money for court costs, three-tenths.

"These parties, and Stephens & Raphiel, with whom Scarborough & Carver had associated

themselves, intervened to protect their rights under this contract.

"After bringing the suit, plaintiff, without the knowledge of his attorneys, made a sale to some outsiders.

"On the trial it was admitted that this sale covered his remaining interest; but by supplemental agreement the admission was modified so as to show that such sale was not of all of plaintiff's interest, but only of two of his remaining three-tenths.

"Part of plaintiff's agreement with his vendees was that he should continue the prosecution of the suit in his name."

Plaintiff is a colored man. He and his two sisters inherited this 80-acre tract of land from their father. Fifteen witnesses for plaintiff and ten for defendant testified as to its value at the time of the redemption sale; the former placing it at $20 to $25 an acre, and the latter at all the way from nothing to $10 or $12. It is not protected from overflow, from Red River, and the soil is of the stiff, buckshot kind, hard to cultivate. It is traversed east and west, about the middle, by a slough called "Lockwood Bay." How much of it is occupied by this slough cannot be ascertained from the record. It is all open, except some four acres, and except that a part of it has been suffered to grow up in young trees; and all cultivatable except the part occupied by the slough and some five acres too low for drainage. The part north of Lockwood Bay is shown to have sufficient fall to be drainable at no very great expense; to be fairly good land of its kind. The part south is lower and flatter, and not easily drainable. With drainage and good cultivation the land could be made to produce well; but this would be expensive, and in the past the crops on it, as a rule have been very poor—not paying ones. There are two negro cabins, or rather shacks, on it, one of which plaintiff occupied; and, as already stated, plaintiff and his sisters, though owning in indivision, possessed in severalty; exactly in what proportion, is not shown except that plaintiff had this part north of Lockwood Bay, and that it is the larger part.

Plaintiff owed a Mr. Crawford two notes of $125 each, secured by mortgage on his undivided one-third interest. Mr. Crawford would not have pressed him for payment if he had continued to live on and cultivate the place, and so informed him; but plaintiff, who was a blacksmith, preferred to move to a neighboring plantation owned by a Mr. Hammett, to ply there his trade. The manager of the place, Mr. Palmer, had persuaded him to do so, and promised to take up the mortgage notes for him. Mr. Crawford then put the mortgage notes in the hands of an attorney, and the latter made a demand of payment by letter. Plaintiff took the letter to Mr. Palmer, and the latter, finding that the debt was $250, plus interest and attorney's fees, instead of $125 as he had understood, referred the matter to Mr. Hammett. The latter declined to take the notes, but said he would try to place them, and applied, over the phone, to defendant, knowing that defendant had money for investment. Defendant expressed his willingness, and a few days thereafter Mr. Palmer accompanied plaintiff to the office of Judge J. C. Pugh, where they met defendant by appointment. Mr. Palmer and defendant testify that on learning what the mortgaged property consisted of, and that the amount of the debt was $261, defendant inquired of Judge Pugh what would be the cost of a foreclosure in the event of nonpayment, and that, on being told that this cost would be $40 or $50 he refused positively to take the notes, as, with these costs added, the debt would be more than the value of the land; and that after further discussion the redemption sale was agreed on and made—the idea being, as was fully explained to plaintiff, that, in the event plaintiff failed to redeem, the land would belong to defendant without the necessity of any court proceedings.

Plaintiff can read and write, and is said

to be intelligent, and his testimony shows it; and we have no doubt at all that he understood the contract perfectly well. At the same time, we are satisfied that, in view of the right which was reserved to him to redeem, and thus to preserve his ownership, he looked upon the land as continuing to belong to him. He leased it for the year 1913 and again in 1914, and collected the rents. In December 1914, he moved back to the place, and built with some old lumber an addition to one of the houses at a cost of $4 or $5. Defendant testifies that he did not concern himself about the land, as he already had lands of similar character which he was not cultivating and did not care to cultivate; that he did not know until about six months before the trial (the trial was in May, 1915) that plaintiff had moved back to the place; that plaintiff was not on the place at the time of the sale, but was living on the Allendale plantation. Defendant admits that his object in making the contract was not to acquire the property, but simply to invest his money. However, that he was not, and would not have been, willing to go into the transaction at all except with the distinct understanding that the property was to be his in the event of its not being redeemed within the time stipulated; and in the latter statement he is corroborated by Mr. Palmer.

[1] The trial judge held that the contract was intended to be a real redemption sale, and not a mere security; and we have reached the same conclusion.

[2] A redeemable sale, unaccompanied by delivery and the price of which is inadequate, courts will consider "without sufficient evidence to the contrary," as a contract merely of security. Collins v. Pellerin, 5 La. Ann. 99; Ware & Son v. Morris, 23 La. Ann. 665; Howe v. Powell, 40 La. Ann. 307, 4 South. 450; Leger v. Leger, 118 La. 322, 42 South. 951.

In this case it is not clear that there was no delivery, nor that the price was inadequate, and there is sufficient evidence that the intention was that the sale should convey the ownership in the event of nonredemption.

Plaintiff was not living on the property, but on Allendale plantation, and, so far as the record shows, no one except the co-owners, plaintiff's sisters, were in actual possession. The notarial act of sale recited that possesion is delivered, and article 2478, C. C., provides that—

"The law considers the delivery of immovables as always accompanying the public act which transfers the property."

And the property that was being sold was not any specific property such as the possession of might be corporeally delivered, but was an undivided interest, of which corporeal delivery could not be made.

"When there is indivision between several persons each one has on the thing, in what concerns his or her quota, all the rights compatible with the purely intellectual nature of this quota, and may exercise them individually and alone; on the other hand, no one may create rights upon the totality of the undivided property or even on any determinate part of it without the consent of the co-owners." Carpentier and Du Saint, Rep. de Droit Français, vol. 24, p. 150, Vo. Indivision, No. 71.

Again, same volume, No. 131:

"The co-owner may revendicate against a third possessor his ideal quota, in order to establish his right of co-ownership; but he cannot oust the third possessor for ouster is allowed only when the revendication bears upon corporeal things."

It may safely be assumed that the corporeal possession of a separate part which plaintiff had theretofore been having, and which his lessees of 1913 and 1914 enjoyed, might have been corporeally transferred to defendant; but this separate part was not what constituted the thing sold. The thing sold was an undivided interest in the whole. The fact that defendant paid no attention

to the property is insignificant. He had no use for it, and had taken a redemption sale instead of a mortgage simply to protect himself against having to incur court costs in the event of the nonpunctual reimbursement of the money he was investing. For absolutely perfecting his sale there was no necessity of his doing more than he did.

[3, 4] As to the inadequacy of price, the fact must not be lost sight of that the proper time for judging of the value of this property was when defendant was considering whether to put out his money on it, and not after it had acquired a value of $100,000 as the result of the discovery of oil. Unconsciously to ourselves the spectacles with which we see things in looking into the past are rendered more or less prismatic by the atmosphere of the present. Land values have been so shifty in this state that testimony with regard to them is much less reliable with us than in places where they are more stable. And especially is this true of agricultural lands subject to overflow. This accounts for the divergence among the witnesses. And also we must not lose sight of the further fact that, in estimating this land before putting out his money upon it, the defendant had the perfect right to rely on his own judgment; and that there is some danger in substituting to the judgment which he then and there thus exercised the after-the-event judgment of the plaintiff's witnesses. Except as throwing light upon what was probably the intention of the contracting parties, inadequacy of price is no more injurious to a redemption sale than to an out-and-out sale. Indeed, perhaps less so; because, naturally a final title ought to command a better price than a defeasible one. We find no ground for doubting that the sole reason why defendant did not take the mortgage notes which he had put himself to the trouble of making and keeping an appointment at Judge Pugh's office to take was that he was doubtful of the sufficiency of the land for affording complete security, and therefore wanted to be protected against the possible expense of judicial proceedings in the event of nonreimbursement. Suspicion of the contract having been resorted to for jockeying plaintiff out of his land is impossible, in view of the fact that defendant did not seek out plaintiff for making the contract, but that plaintiff sought out defendant, and that the original intention was simply to take the mortgage notes; and, furthermore, that defendant did not at that time care to have the land; but only to invest his money, and would have taken the notes if the margin between the value of the land and the amount to be put out had appeared to him to be sufficient to secure the amount of the notes plus interest, and, in the event of a foreclosure and possibly also of a suit for partition, the expenses of these judicial proceedings in attorney's fees and court costs. A mere pignorative contract would have necessitated judicial proceedings and expense for enforcement, the same as a mortgage.

[5] While in a case of this kind the writings which the parties have drawn up for evidencing their contract are not absolutely conclusive, or absolutely binding on the court, yet in the absence of all suspicion of undue advantage or cozenage they are entitled to very great weight, for the purpose of their execution has been to furnish proof of the contract. In the present case the plaintiff was well able to understand the nature of the contract he was entering into, and to take care of his interests, and if it had been otherwise, Mr. Palmer, who had accompanied him to the office of Judge Pugh, would hardly have allowed any undue advantage to be taken of him, and Judge Pugh would hardly have allowed any deception to be practiced. Plaintiff has shown too much intelligence, if not shrewdness, on the witness stand for his plea of not having understood the contract to prevail. Either there was actual decep-

tion practiced on him in Judge Pugh's office, or he understood that he was not making a mere security contract but a real redemption sale; that while defendant did not care to have the land, and, in fact, would have preferred to have his money, with the interest increment, returned, yet that he was positively unwilling to take a mere security contract, for the enforcement of which expenses in attorney's fees and court costs would have to be incurred. From the evidence, the defendant is a man of large means and a business man. Such being the case, it is hardly to be supposed he would have declined a perfectly good security contract, for the enforcement of which the attorney's fees would have had to be paid by the debtor, and accepted in its place a no better security contract, for the enforcement of which he himself would have to pay the attorney's fees. He might have done so if his intention had been to take actual possession of the property and derive revenues from it, but the facts of the case show that he had no such intention. The fact that his motive was merely to invest his money, and that so long as the delay for redemption had not expired he looked upon the transaction in that light, does not detract from the reality of the sale. Not one redemption sale in every hundred, we imagine, and we speak of real redemption sales, not pignorative contracts, has for its motive on the part of the vendee the acquiring of the property; and this is what has led the courts to treat them as merely pignorative where the price has been vile and no actual, genuine possession has been taken, and the proof does not show that a real sale was intended; but it does not follow from this that in such a case the parties may not agree that in the event of nonredemption within the delay specified the sale shall become final. To hold otherwise would be practically to wipe out of the Code the chapter treating of redemption sales. That defendant looked upon the contract in that light—that is to say, as one by which so long as the delay for redemption had not expired the land should merely stand as security for reimbursement of his money—we have no doubt; but we equally have no doubt that he at the same time looked upon it as a contract that would be a final sale in the event there was no redemption.

Plaintiff relies much upon the statement made by defendant to Mr. J. W. Butler as being an admission that the contract was a mere lending of money upon security. After the land had become immensely valuable as the result of the discovery of oil, and sui was about to be brought by plaintiff, defendant thought that by putting the title in the name of a third person the suit would be circumvented, or, as he and Mr. Butler express it, the matter would be "kept out of court." On being put upon the witness stand for cross-examination, under the statute, defendant frankly admitted that that was the purpose and nature of this transfer; and Mr. Butler, as a witness, was equally frank in the matter. Mr. Butler was questioned, and he answered as follows:

"Q. Well, give us as near as you can all that took place on that occasion. A. He told me he wanted to transfer it to me to keep it out of court. He explained to me about his transaction with this negro. I don't remember what that was now. Q. Well, tell us to the best of your recollection about it. A. About his trade with the negro? Q. Yes. A. He had loaned the negro some money, as well as I can remember, and the negro had given him the place as security, and if he did not redeem it at the end of a year, that the place would be his; something like that."

But this so-called "admission" differs in no wise from the attitude of defendant in this case. He does not pretend that his motive in entering into the transaction was to acquire the property, except the mineral rights. It will be noted that the difference between the purchase price of $261, and the

amount of $281, fixed for the redemption, corresponds with interest on $261 at 8 per cent. per annum. The admission, taken as a whole, shows that the understanding was that in case of nonredemption defendant was to become owner.

Admission against admission, we do not see that the statement made by defendant to J. W. Butler is more significant than those made by plaintiff to his witness Mr. Teekle and to defendant's witness Mr. Hammett. Mr. Teekle testified:

"I met up with Jim Butler and asked him' where he was living, and he told me. I asked him about his place, and he said Mr. Marston had paid off the debt to Mr. Crawford for him, and that he had turned the place over to Mr. Marston, and that Mr. Marston was to retain the mineral rights on the place, but would give him a chance to repay the purchase price of the place and redeem the surface of it. Q. Didn't Jim Butler tell you that he had sold the place to Mr. Marston, but with the right to redeem it? A. Yes, sir."

Mr. Hammett testified:

"The next morning" (after the day of the sale) "I went to the blacksmith shop where Jim was at work, and asked him if he had made arrangements. Jim said he had; that he gave Mr. Marston a deed to the property with a privilege of redeeming it within one year, Mr. Marston reserving the mineral rights."

Mr. Crawford, plaintiff's witness who had an unsecured claim of $275 against him, made no effort to collect the debt or to reduce it to judgment because plaintiff—

"had nothing to collect from. Q. You understood that he had sold his land to Marston, didn't you? A. Yes, sir. Q. Did Butler tell you that he sold out to him, but had a year within which to redeem it? A. Well, he told me that there had been a conditional sale. Q. And you felt sure that you could not get anything out of the land? A. Yes, sir."

[6] Honest contracts must be enforced or have effect as made. A redemption sale if really such and not a pignorative contract, must be given the effect of a redemption sale and not of a pignorative contract.

We may add that we are entirely satisfied from the evidence that mineral rights in that neighborhood were considered to be of little or no value. In the course of the conversation, on the morning after the sale, Mr. Hammett congratulated plaintiff on the arrangement he had made, and told him that so far as the mineral rights were concerned they were valueless; if on that occasion plaintiff entertained a different idea of the matter, he did not give expression to it.

Judgment affirmed.

O'NIELL, J., dissents from the conclusion of fact.