183 So. 349

## GAUTREAUX et al. v. HARANG et al.

## No. 34673.

July 7, 1938.

Rehearing Denied Aug. 5, 1938.

Tracy & Newhauser and Guion & Schulze, all of New Orleans, for appellants.

Howell & Deramee, of Thibodaux, for appellees.

E. Howard McCaleb, of New Orleans, for appellees on application for rehearing.

A. J. Caillouet, Lawrence H. Pugh, Francis L. Knobloch, Walter Irving Lanier, Taylor Beattie, Anthony P. Musso, and J. A. O. Coignet, all of Thibodaux, Claude Ellender, J. Louis Watkins, H. M. Wallis, Jr., Robert B. Butler, Jr., and M. Lottinger, all of Houma, and C. A. Morvant, of Thibodaux, amici curiæ on issue of fraud with respect to instrument of October 30, 1936.

LAND, Justice.

(1) On February 14, 1923, Olivanne Acosta executed by notarial act before A. L. Deramee, Notary Public for the Parish of Lafourche, the transfer of a certain tract of land in that Parish:

"*Being the same property,* acquired from D. Harang about the *year 1920.*

"Appearers hereby declare by these presents, that *this sale is made to secure a debt on said described property and that no Revenue Stamps are to be attached hereto.*

"The price and consideration for which this sale is made is declared to be the sum of *Thirty-Seven Hundred and Fifty ($37-50.00) Dollars cash in hand paid, at the signing hereof,* the receipt of which is hereby acknowledged."

This act of transfer was recorded in the Parish of Lafourche February 16, 1923. T. 23, 24.

Olivanne Acosta, vendor, although a resident of Lafourche Parish, died intestate on the 23rd day of September, 1934, at the Baptist Hospital in the City of New Orleans.

Dominique Harang departed this life in the Parish of Orleans, the place of his domicile, on the 8th day of August, 1923.

On January 30, 1937, the widow and heirs of Olivanne Acosta executed a sale by notarial act to James J. Tracy of an undivided one-half interest in this property. This act of sale was recorded in the Conveyance Records of Lafourche Parish February 1, 1937. T. 25, 26, 27, 28.

(2) The widow and heirs of Acosta, and Tracy now sue to be recognized as the owners of the tract of land mentioned in the act of February 14, 1923, *alleging that said act establishes an antichresis in favor of the apparent vendee, Dominique Harang,* to secure the payment of certain mortgage notes executed by Olivanne Acosta on this property, amounting to the sum of Three Thousand Seven Hundred and Fifty Dollars ($3750).

Defendants, on the other hand, contend that the act of February 14, 1923, is a cash sale, and that these identical mortgage notes were surrendered by Olivanne Acosta in payment of the cash purchase price of Three Thousand Seven Hundred and Fifty Dollars.

(3) The act of February 14, 1923, does not pretend to create a *present existing indebtedness* for which the sale is made as a security. But, it does specifically refer to *a pre-existing indebtedness* in the declaration "that this sale is made *to secure a debt on said described property, being the same property* acquired from D. Harang about *the year 1920."*

Referring to the notarial act of sale from Dominique Harang to Olivanne Acosta, made January 9, 1920, we find that "the debt on said described property", referred to in the act of February 14, 1923, consisted of $3,750, in five mortgage notes on this property, executed by Acosta, the purchaser, for the payment of the balance of the purchase price; and we observe also that the amount of these mortgage notes is the identical amount of $3,750, stated in the act of February 14, 1923, *as the amount of the cash purchase price* alleged to have been paid for the property described in that act.

It is stated in the act of sale from Harang to Acosta, of date January 9, 1920, *"and for the balance of said purchase price the said purchaser has furnished his five certain promissory notes* dated this day drawn by himself to the order of and endorsed by himself in blank as follows: 1st note for $700 payable one year after date, 2nd note for $750 payable two years after date, 3rd note for $750 payable three years after date, 4th note for $750 pay-

able four years after date, and 5th note for $800 payable five years after date, with interest at the rate of eight per cent per annum from date, payable annually until final payment of said notes, which after having been paraphed "Ne Varietur" by me Notary for identification herewith *were delivered to the said vendor* (Harang) *who acknowledged receipt thereof."* T. 21.

The total of these five notes makes exactly $3750, the identical amount of the cash purchase price stated in the act of sale from Olivanne Acosta to Dominique Harang of date February 14, 1923. No question can arise as to the exact amount of principal and interest due under these notes, nor as to the exact time of the payment of the principal and interest. There is therefore no such vagueness in the act of sale in this case as to the indebtedness to be paid under the sale as a security as would invalidate the act as an antichresis.

In order to make certain that no ambiguity could arise as to the question, whether this act of sale was intended by the contracting parties as a security for this pre-existing indebtedness, the words "No *Revenue Stamps* are to be attached hereto" follow immediately the words "Appearers hereby declare by these presents *that this sale is made to secure a debt on said described property."*

The applicable Federal Statute in force at the time of execution of the sale of February 14, 1923, relied upon by plaintiffs as the act of antichresis, with reference to documentary stamps, reads as follows:

"Conveyances: Deed, instrument, or writing, whereby any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his, her, or their direction, *when the consideration or value of the interest or property conveyed,* exclusive of the value of any lien or encumbrance remaining thereon at the time of sale, exceeds $100 and does not exceed $500, 50 cents; and for each additional $500 or fractional part thereof, 50 cents. *This subdivision shall not apply to any instrument or writing given to secure a debt."* Revenue Act 1921, c. 136, title 11, Stamp Taxes, Schedule A, par. 6, 42 Stat. 305. Only the trivial amount of $3.50 was due for Revenue Stamps when the act was passed. The very language itself of this Federal Statute is written into the act of sale of February 14, 1923: *"to secure a debt"* and "on said described property."

■ (4) That the purpose of the contracting parties, in making the sale in act of sale of February 14, 1923 was "to secure a debt on said described property" cannot be well doubted, since the language used in this act is plain and free from all ambiguity.

Article 1945 of the Revised Civil Code, par. 3, declares:

"That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences."

■ As stated in the syllabus of Rolland's Heirs v. McCarty, 19 La. 77:

"The court will not presume, that parties make use of words in their contracts to which no meaning is attached by them. Some effect is to be given to every word if possible; and but rarely will the court reject words or phrases in a contract as surplusage."

(5) "The pledge is a contract by which one debtor gives something to his creditor as a security for his debt." R.C.C. Art. 3133.

"There are two kinds of pledge:

"The pawn.

"The antichresis." R.C.C. Art. 3134.

"*A thing* is said to be *pawned* when a movable thing *is given as security;* and *the antichresis, when the security given* consists in *immovables*. R.C.C. Art. 3135.

"Every lawful obligation may be enforced by the auxiliary obligation of pledge." R.C.C. Art. 3136.

"It is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right." R.C.C. Art. 3152.

"The antichresis shall be reduced to writing.

"The creditor acquires by this contract the right of reaping the fruits or other revenues of the immovables to him given in pledge, on condition of deducting annually their proceeds from the interest, if any be due him, and afterwards from the principal of his debt." R.C.C. Art. 3176.

"The creditor is bound, unless the contrary be agreed on, to pay the taxes, as well as the annual charges of the property which have been given to him in pledge.

"He is likewise bound, under penalty of damages, to provide for the keeping and useful and necessary repairs of the pledged estate, saving himself the right of levying on their fruits and revenues all the expenses respecting such charges." R.C.C. Art. 3177.

"The debtor can not, before the full payment of the debt, claim the enjoyment of the immovables which he has given in pledge. But the creditor who wishes to free himself from the obligations mentioned in the preceding articles, may always, unless he has renounced this right, compel the debtor to retake the enjoyment of his immovable." R.C.C. Art. 3178.

"*The creditor does not become owner of the pledged immovable by failure of payment at the stated time; any clause to the contrary is null,* and in this case *it is only lawful* for him *to sue* his debtor before the court in order *to obtain a sentence against him,* and to cause *the objects* which have been put in his hands *in pledge to be seized and sold."* R.C.C. Art. 3179.

"When the parties have agreed that the fruits or revenues shall be compensated with the interest, either in whole or only to a certain amount, this covenant is performed as every other which is not prohibited by law." R.C.C. Art. 3180.

"Every provision, which is contained in the present title with respect to the antichresis, can not prejudice the rights which

third persons may have on the immovable, given in pledge by way of antichresis, such as a privilege or mortgage.

*"The creditor, who is in possession by way of antichresis* can not have any right of preference on the other creditors; *but if he has by any other title, some privilege or mortgage lawfully established or preserved thereon,* he will come in his rank as any other creditor." R.C.C. Art. 3181.

It is very clear that the stipulation above referred to in the instrument of February 14, 1923, intended to create, and did create, the act of sale an antichresis, the pledge of an immovable. It was reduced to writing. Possession was delivered to the pledgee. It was a pledge to secure *a pre-existing* "debt on said described property", in principal and interest, which was set out in the act of sale from Harang to Acosta of January 9th, 1920.

■ (6) In Maestri v. Board of Assessors, 110 La. 517, 522, 34 So. 658, 660, it was held that, under Article 3176 of the Revised Civil Code, it is necessary in a contract of antichresis "that there should be *a pre-existing debt, at the time the contract is entered into."* But in the more recent case of Conklin v. Caffall, 189 La. 301, 179 So. 434, it is said, (page 438) in discussing the Maestri Case:

"It is not necessary in this case to go so far as to say that a pre-existing debt is essential to the contract of antichresis.

"It is sufficient to say that, as an antichresis is only an ancillary contract, it must have a debt or principal obligation to support it—*whether the obligation be a pre-ex-*

*isting one or be incurred in the making of the antichresis."*

As also said in Conklin v. Caffall, supra:

■ "As the relation of debtor and creditor, between the parties to the contract, is essential to a contract of antichresis, the evidence of that relation must be in writing."

In the case at bar, there was "a pre-existing debt", the five mortgage notes on the property aggregating the sum of $3750.00, evidenced by the Act of Sale from Acosta to Harang of date January 9, 1920. Not only was Acosta the owner of the property; not only did he deliver possession of the property to Harang; not only was Acosta the debtor and Harang the creditor, but "the evidence of that relation" is "in writing".

■ (7) No technical form in the confection of the contract of antichresis is required in this State.

In Calderwood v. Calderwood, 23 La. Ann. 658, John Calderwood made a contract in the form of a sale with his brother, William Calderwood, in reference to certain stores and other property in Monroe, La., and at the same time, a counter letter was executed, and signed by them. In that case the Court said:

"The idea of a sale is utterly precluded if effect be given to that clause of the counter letter which says: 'Whereas, John Calderwood is indebted unto William Calderwood in the sum of twenty-four hundred and seventy dollars in United States treasury notes for services. Now, therefore, *the aforesaid sale and transfer is made to*

*secure and guarantee the payment of said sum of money.'*" Page 660.

"William Calderwood holds the property, which is immovable, by a contract of pledge, disguised, however, under the form of a sale. It is *an antichresis* by which contract he acquires—'the right of reaping the fruits or other revenues of the immovables to him given in pledge on condition of deducting annually their proceeds from the interest, if any be due him, and afterwards from the principal of his debt.' Revised Civil Code, Article 3176." Pages 661, 662 (Italics ours.)

On rehearing, it is said by the Court:

"Persons are presumed to contract in reference to the law. The pledge of a movable is a pawn, the pledge of an immovable is an antichresis. R.C.C. art. 3135.

"*      *      *      *      *      *

"The contract being a pledge of immovables, is regulated by this article [R.C.C. art. 3176], in the absence of the stipulation or covenant permitted by article 3180. The law regulates the effect of a contract except in such cases as the same may be modified by the covenant of the parties under the law permitting the said modification. The parties have not modified the antichresis in the case before us by a covenant under article 3180, and we therefore conclude that it must be regulated by article 3176."

In other words, it is held in Calderwood v. Calderwood, 23 La.Ann. 658, where it is agreed that a sale and transfer of an immovable is made to secure the payment of a debt, that the contract is a pledge of an immovable and an antichresis, and that Article 3176 of the Revised Civil Code is read into such a contract.

In Wolf v. Wolf, 12 La.Ann. 529, this Court said:

"Neither does it follow, because parties have clothed their contract in one form instead of another, that it will not avail in either. There is no penalty declared by the law-giver, and the courts cannot supply it. Then is there anything immoral in using the contract of sale as the security of money advanced or to be advanced in good faith? We think not. The Civil Code has itself traced certain provisions of law in regard to sales with the power of redemption."

In Ware & Son v. Morris, 23 La.Ann. 665, the defendant conveyed to plaintiff, in the form of a sale, certain property, and a counter-letter was drawn and signed by the parties. It is said in that case in part:

"No doubt it is lawful to secure a debt under an apparent act of sale, but it is nevertheless a pledge or hypothecary right which really subsists between the parties, concealed, however, behind the false appearance of the contract of sale. *In such a case the title never passes;* the real contract may be a *pledge or mortgage*—the apparent one *a sale.*  *  *  *

"The character of the contract in this case is easily determined from the counter letter, where the real purpose of the parties is expressed. Between the parties the counter letter is as operative *as if its recitals and stipulations had been expressed*

*in the notarial act. We apprehend that if such had been done this suit never would have been instituted; the purpose and object of the contract would have been too apparent."*

In Livingston v. Story, 11 Pet. 351, 9 L. Ed. 746, it is said by the Supreme Court of the United States (page 386):

*"For although the conveyance of the 25th of July, 1822, is, in form, a positive sale, yet the counter letter explains its nature as fully as if it were inserted in that conveyance."*

In the case at bar, instead of the nature of the contract of sale being stated in a separate counter letter, it is stated in the contract of sale itself as follows:

"Appearers hereby declare by these presents, *that this sale is made to secure a debt on said described property and that no Revenue Stamps are to be attached."*

Necessarily, this declaration in the act of sale itself has as much effect as if it had been made in a separate counter-letter; since "Between the parties the counter letter is as operative as if its recitals and stipulations *had been expressed in the notarial act."*

██ (8) Nor is the contract of antichresis in this case affected by the fact that Harang, in whose favor the contract is made, also had a previous mortgage on the same property.

It is expressly provided in Article 3181 of the Revised Civil Code that:

"Every provision, which is contained in the present title with respect to antichresis, can not prejudice the rights which third persons may have on the immovable, given in pledge by way of antichresis, such as a privilege or mortgage.

*"The creditor, who is in possession by way of antichresis* can not *have any right of preference* on [over] the other creditors; *but if he has by any other title, some privilege. or mortgage lawfully established or preserved thereon,* he will come in his rank as any other creditor."

Article 3181 of the Revised Civil Code, above cited, *specifically recognizes* the right of a creditor in possession of an immovable, under an antichresis, to have, at the same time, *a mortgage on the same property,* and provides that "he will come in his rank as any other creditor."

Harang, on January 9th, 1920, sold the property in dispute in this case to Acosta, and having retained a special mortgage on the property to secure the unpaid balance of the purchase price of $3750. On February 14, 1923, this mortgaged property was sold by Acosta to Harang "to secure the debt on said described property", thereby creating the pledge of an immovable, or what is known as an antichresis.

In the very teeth of Article 3181 of the Revised Civil Code permitting a creditor with an antichresis to have a mortgage *on the same property,* the argument of defendants, that it is inconsistent to have a co-existing antichresis with a mortgage on the same property, has not the slightest merit and falls of its own weight, unless, indeed, it be inconsistent for a creditor to exercise the plain legal rights expressly

granted to him under the Civil Code of this State.

The mortgage gave to Harang only the right to foreclose on this property and to have same sold at public sale for the payment of the debt. Under the mortgage, Harang had no right to possession of the immovable, and no right to reap the fruits or other revenues of the immovable given to him in pledge, and to deduct annually from the interest and afterwards from the principal of his debt. This right was secured to him only under the antichresis. R.C.C. Art. 3176.

Instead of foreclosing on the property, Harang exercised the right given to him under the antichresis, took possession of the property, under the act of antichresis of date February 14, 1923, received the fruits or revenues from same during his lifetime, and his heirs, after his death, continued to possess the property and to exercise the same rights.

(9) In Payne v. Joe and Jack Habbard, 42 La.Ann. 395, 7 So. 572, the court said:

"The plaintiff held *a mortgage* on the Hermitage plantation, the property of defendants, and proceeded to foreclose the same. While the property was under seizure, and about to be sold, an agreement was entered into between plaintiff and defendants, by which the latter gained two years' time, in annual installments, to pay the mortgage debt.

"The contract was made *in the form of a sale à rémeré*. The defendants leased the property conveyed to plaintiff by them. The plaintiff also agreed to furnish defendants supplies for the year. The defendants failing to pay for the supplies and the rent, the plaintiff proceeded against them by writs of sequestration, provisional seizure, and attachment.

"The defendants deny plaintiff's right to sue for the rent, as he is not *the owner of* the Hermitage plantation. [Italics ours.]

"They contend *that the contract entered into by them with plaintiff was not a sale of said plantation with the right of redemption, but a pignorative contract; by which the plantation was conveyed to plaintiff as security for a mortgage debt.* He also prayed that if the sale should be considered one of *à rémeré,* that it be declared null and void for lesion."

It is further stated in the opinion in this case:

"The creditor took possession of the property *as a pledge for a debt due him.* He immediately leased it to the debtor, *and thus reaped the revenues of the thing given to him in pledge.*

"He could not become *the owner on failure of defendants to make the first payment, and the clause to this effect in the contract is a nullity.* He has the right, however, to have the pledged immovable, the Hermitage plantation, seized, and sold to pay his debt. R.C.C. art. 3179." (Italics ours.)

On application for rehearing, the Court said:

"Plaintiff and appellant complains that our decree maintains the contract between him and defendants *as an antichresis secur-*

*ing a mortgage debt of the latter* to him of $1,354.50; whereas, it should have been stated that the sum bore 8 per cent. per annum interest from the date of the contract, February 21, 1888.

"The applicant has misconstrued our decree. It explicitly stated *that the contract of pledge did not, in any respect, modify the previous act of mortgage. It was left in force, and plaintiff was permitted to select which of the two—the act of pledge or the mortgage—he would proceed to enforce. Both are valid and binding as securities for the payment of one and the same debt. He must look to and rely upon those acts for ascertainment of the extent of his rights and the amount of his debt and its interest."* (Italics ours.)

■ So in the case at bar, the contract of pledge, or antichresis, did not modify the previous act of mortgage in favor of Harang, who was permitted to select which of the two he would proceed to enforce. Both were valid and binding as securities *"for the payment of one and the same debt".*

This Court has even held that:

"*A mortgage* in favor of *one creditor,* not put into action by *fieri facias* or writ of seizure, *may co-exist with an antichresis* in favor of *another creditor. The antichresis operates upon the fruits,* which the creditor, holding it, is thereby authorized, by his debtor to gather. A mortgage affects *the land.* If the holder of the antichresis gathers the fruits before the mortgage creditor seizes, he can apply them to his debt." Pickersgill & Co. v. Brown, 7 La.Ann. 297, 314. (Italics ours.)

(10) It is specifically provided in Article 3179 of the Revised Civil Code that:

*"The creditor does not become owner of the pledged immovable by failure of payment at the stated time; any clause to the contrary is null, and in this case it is only lawful for him to sue his debtor before the court in order to obtain a sentence against him, and to cause the objects which have been put in his hands in pledge to be seized and sold."*

■ It is the settled jurisprudence of this court that the contract of antichresis, being pignorative in its nature, does not vest title in the creditor in case of failure to pay, when the property is to be sold by judicial sentence, and the sum which it may bring, over the amount for which it is pledged, is to be paid to the person making the pledge, Calderwood v. Calderwood, 23 La.Ann. 658, 662; Ware & Son v. Morris, 23 La.Ann. 665, Payne v. Habbard, 42 La. Ann. 395; see also Livingston v. Story, 11 Pet. 351, 9 L.Ed. 746.

It is not pretended that Harang, in whose favor the antichresis was created, has, or that defendants, his heirs, have, at any time, applied to the District Court for the Parish of Lafourche, in which the immovable pledged is situated, to have this property seized and sold by judicial sentence. Nor is it pretended that Harang has, or that his heirs have, at any time, foreclosed his previous mortgage on this property, and purchased the property at public sale.

The antichresis is of date February 14, 1923. Acosta did not die until September 23, 1934, or eleven years and seven months

later, but there is no evidence in the record to show that the heirs of Harang, at any time during these eleven years and seven months, claimed that this was a *cash sale,* and made any demand upon Acosta to re-transfer this property to them.

Conceding that Acosta, the debtor, "failed of payment at the stated time", Harang, the creditor, did not thereby become the owner of the pledged immovable, and, if *"any clause to the contrary"* had been placed in the act of sale of this property as security for the payment of the previous mortgage debt, such clause would have been absolutely "null", void and of no legal effect whatever, under Article 3179 of the Civil Code, a prohibitory law, and under the settled jurisprudence of this court.

■ The mere fact that, in this case, Harang cancelled the mortgage notes on the pledged immovable, did not have the legal effect of transferring to him the ownership of this property.

■ It was the plain legal duty of Harang, in possession of the pledged immovable, under an antichresis to pay the taxes on this property. R.C.C. art. 3177. Neither the payment of these taxes, nor the fact that Harang caused the property to be assessed in his name, resulted in any title in him, the creditor, for *"it is only lawful* for him *to sue his debtor* before the court to obtain *a sentence against him,* and to cause the objects which have been put in his hands *in pledge to be seized and sold."* Article 3179.

■ The fact that Harang and his heirs have been in possession of this property since February 14, 1923, does not vest in him, or in them, the title, for the plain reason that such possession is not as owner under a title translative of property. Besides, "It is essential to the contract of pledge that the creditor be put in possession of the thing given him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right." Article 3152.

In this case, we are not dealing with a cash sale, by any means, but with a plain, unambiguous pledge of an immovable as security for the payment of a pre-existing mortgage indebtedness, an antichresis. The title to the property in dispute was in Acosta on February 14, 1923, when the contract of antichresis was entered into by him in favor of Harang, his creditor. That title continued in Acosta up to the time of his death, September 23, 1934, upon the public records of the Parish of Lafourche, and, at his death, one-half interest in this property was inherited by his heirs, and the other half interest became vested in his surviving widow in community, the plaintiffs in this case. The title to this property was still in the surviving widow in community and in the heirs of Olivanne Acosta, deceased, when they conveyed an undivided one-half interest in and to the same to their co-plaintiff, James J. Tracy. The transfer was made January 30, 1937, by notarial act which was recorded February 1st, 1937, in Conveyance Book No. 79, folio 400, Entry 33890, in the Conveyance Records of the Parish of Lafourche, Louisiana. T. 25, 26, 27, 28.

In other words, the title of Olivanne Acosta had remained on the public records

of Lafourche Parish in his name from the date of the sale made to him by Dominique Harang, January 9, 1923, to February 1st, 1937, during a period of 14 years, without being questioned or changed in any particular.

(11) On the trial of this case, defendants placed upon the witness stand a single witness, A. L. Deramee, Notary Public of Lafourche Parish, before whom the act of sale constituting the antichresis in this case was passed on February 14th, 1923.

It was proposed by defendants to prove by this witness *the verbal statements* of both Olivanne Acosta and Dominique Harang, *made prior to the drafting of the contract,* and to substitute such statements, contrary to the terms of the written contract, as evidencing the mutual understanding and agreement which the contracting parties desired the Notary to prepare and execute.

The *verbal statements* of Olivanne Acosta and Dominique Harang, *both deceased,* which the Notary proposed to testify to are as follows:

(1) That the contracting parties had agreed to *a sale and transfer* of title of said property by Olivanne Acosta in consideration of the cancellation of Olivanne Acosta's unpaid promissory notes, amounting in principal and interest to $3750.00.

(2) That the Notary then drew up an act of *cash sale,* and, after completing the drafting of the instrument, a question arose as to revenue stamps. That the Notary advised the parties that he could insert a clause in the already completed instrument without changing the legal effect of the instrument and then wrote in the contract the following, to-wit:

"Appearers hereby declare by these presents *that this sale and transfer is made to secure a debt on said described property and that no revenue stamps are to be attached hereto."*

The proposed testimony of the Notary was objected to by counsel for plaintiffs, "Because the evidence has for its purpose *the constituting of Dominick Harang, the proprietor of the property and not the pledgee of the same, of vesting in him an absolute title of property,* all in violation of the laws of the State of Louisiana."

The testimony of the Notary was admitted over the objection of counsel for plaintiffs, and the ruling of the trial court, in our opinion, is clearly erroneous.

In Calderwood v. Calderwood, 23 La.Ann. 658, John Calderwood made a contract *in the form of a sale* with his brother, William Calderwood, in reference to certain stores and other property in Monroe, La., and, at the same time, a counter letter was executed and signed by them, containing the following clause:

"Whereas, John Calderwood *is indebted* unto William Calderwood in the sum of twenty-four hundred and seventy dollars in United States treasury notes for services. Now, therefore, *the aforesaid sale and transfer is made to secure and guarantee the payment of said sum of money."*

The executrix and universal legatee of John Calderwood alleged in that case, as is alleged in the case at bar: that by the

rents derived from the property, William Calderwood had received largely more than the amount for which the property was given in pledge, and sued to compel the retransfer of the property according to the stipulation of the counter letter.

In the opinion in the Calderwood Case it is said:

"*The defendant, William Calderwood, denies that the contract was a pledge, but contends it was a sale, with the right of redemption—a vente à réméré; that as owner the fruits or revenues belong to him,* and he is not bound to reconvey the property until the repayment of the twenty-four hundred and seventy dollars as stipulated, which the plaintiff has failed to tender.

"He sought *by parol evidence* to prove that this was the intention of the parties, and the court very properly rejected the evidence of the witnesses. *Parol evidence* will not be admitted against or beyond what is contained in the acts, nor on what may have been said before or at the time of making them or since. C.C. art. 2256." Page 659.

"If the contract be *a sale* what is the use of talking about *securing a subsisting debt* of $2470? That being paid as part of the price, ceased to be a debt; *by the sale the obligation would be discharged,* which the *sole purpose* of the counter letter, it seems was to *preserve and to secure.*

"Looking to the instrument wherein the parties have reposed *their true intention and object,* we say there was *neither an intention to buy nor to sell,* but rather to disguise the contract of pledge under the false appearance of the contract of sale. *It is the real, not the apparent, contract* which is sought to be enforced and which *should be enforced.*" Page 661. (Italics ours.)

So, in the instant case, if the contract was a *cash sale,* what is the use of talking about securing the balance of the purchase price of $3,750? By the *cash sale* this indebtedness would be discharged, although the sole purpose of the sale was to preserve and secure this indebtedness by the pledge of the immovable upon which it existed *as a security.*

It is clear, therefore, that the purpose of the *parol evidence* in this case was to prove title to real estate, when no title whatever existed in Harang, the mere pledgee by way of antichresis. Of course, this cannot be done, or permitted in this case.

Besides, the verbal statements upon which the *parol evidence* is based are the statements of Acosta and Harang, the contracting parties, made prior to the drafting of the act. Both of these parties *are dead.*

In the recent case of John W. Foscue et al. v. Minnie A. Mitchell et al., 182 So. 740, this Court had occasion to observe that "*courts of justice lend a very unwilling ear to statements of what dead men had said*". The Notary who drafted the Act of Antichresis between Acosta and Harang of date February 14, 1923, had served under a notary's commission for 14 years. He testified that he knew the meaning of the word "Security" and, undoubtedly, he knew the meaning of the word "Paid"; yet the Notary testified in this case that he made *an error*

in writing the word "security" in the act of antichresis, and intended to write the word *"paid"*. The words are so dissimilar in spelling and in meaning, and in appearance, that this Court is not impressed by such testimony.

(12) We now pass to a discussion of the instrument of October 30, 1936 which was recorded February 12, 1937, after the sale to James J. Tracey of an undivided one-half interest in this property by plaintiffs had been recorded February 1st, 1937. This instrument is as follows:

"State of Louisiana

"This declaration is made freely and voluntarily on this 30th day of October, A. D. 1936, by Mrs. Emma Gautreaux, widow of Olivanne Acosta, Mrs. Octavie Acosta, wife of Paul Parr, Mrs. Ida Acosta, wife of Albert Trosclair, Mrs. Valerie Acosta, wife of Abel LeBlanc, Mrs. Bella Acosta, wife of Alcest Savoie, Mrs. Linda Acosta, wife of Fedless Schouest, Mrs. Helen Acosta, wife of Joe Chamenta, Abel Acosta and Lonia Acosta, are those who execute this instrument.

"Witnesseth:

"That whereas, by act before A. L. Demaree, a Notary Public, under date of February 14, 1923, their late husband and father Olivanne Acosta sold, conveyed, assigned, set over and delivered unto Dominique Harang, husband of Mrs. Emily Hebert the following described property, to-wit:

"A certain tract of land situated in the Parish of Lafourche, State of Louisiana, on the left descending bank of Bayou Lafourche, at about twenty-eight (28) miles

below the town of Thibodeaux, and measuring one and one half (1½) arpents, by the ordinary depth of forty (40) arpents, between parallel lines; bounded above by lands of Abel LeBlanc, and below by lands of Igniasse Plaisance

"That, whereas, the said act of conveyance, mentioned was a price of Thirty seven hundred and fifty ($3750.00) Dollars cash:

"That, whereas, the said act of conveyance would possibly imply that instead of a cash transfer this conveyance was to secure a debt, *that actually in truth and in fact the said Olivanne Acosta, did sell, convey, transfer, set over, and deliver unto Dominique Harang the hereindescribed property for the consideration of Thirty seven hundred and fifty and no/100 ($3750.00) dollars, that the aforedescribed deed before A. E. Demaree bearing the date of February 14th, 1923, is none other than an actual sale and transfer and at no time was intended to be a conveyance in order to secure a debt,* and

"Mrs. Anna Gautreaux, widow of Olivanne Acosta, Mrs. Octavie Acosta, wife of Paul Parr, Mrs. Ida Acosta, wife of Albert Trosclair, Mrs. Valerie Acosta, wife of Abel LeBlanc, Mrs. Bella Acosta, wife of Alcest Savoie, Mrs. Linda Acosta, wife of Fedless Schouest, Mrs. Helen Acosta, wife of Joe Chamenta, Abel Acosta and Lonia Acosta are those who execute this instrument now declare that they have no rights, titles or interest or pretensions whatever in and to the aforesaid described property and they do now declare that they quit claim, set over and deliver, whatever

rights, titles or interest, if any they have, in the aforesaid land, but do hereby declare that they have no rights titles or interest whatever therein."

We have already held in this case that the Act of Sale of February 14, 1923, as security for the payment of the mortgage debt of $3750 on this property was not a cash sale, but the pledge of an immovable, or an antichresis. We have already decided that, under Article 3179 of the Revised Civil Code, Harang, the creditor, did not become *the owner* of the pledged immovable by the failure of Acosta to make payment of the mortgage notes at the time stated in these notes, and that any clause to the contrary would have been null and void and of no legal effect. That the only lawful right that Harang, as creditor, had under the antichresis was to sue Acosta in court, obtain a judicial sentence against him, and cause the immovable put in his hands as a pledge by Acosta to be seized and sold.

Neither the heirs of Acosta, nor the heirs of Harang, inherited from decedents any greater rights than the decedents themselves possessed under Article 3179 of the Revised Civil Code, a prohibitory law.

It follows, necessarily, that the heirs of Acosta were without any legal right or authority, standing as they do in the shoes of their deceased father, to declare the contract of antichresis in this case not to be a security for a debt, but a cash sale, thereby vesting in the heirs of Harang an absolute title; nor do the heirs of Harang, in the face of a prohibitory law, have any legal right or authority to accept such sale.

The character of the contract of antichresis was not changed by the death of either Acosta or Harang, but decedents transmitted to their heirs the same rights and obligations which they possessed and by which they were bound.

"Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals." R.C.C. Art. 11.

"Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed." R.C.C. Art. 12.

In Livingston v. Story, 11 Pet. 351, 9 L. Ed. 746, the Supreme Court of the United States held the original contract with the counter letter to be an antichresis. Thereafter, *a new agreement* was made, in order to obtain an extension of time, increasing the sum to be paid and declaring that a failure of payment would vest absolute title in the pledgee.

After holding the original sale with counter letter to be an antichresis, the Supreme Court of the United States said (page 391):

"Such an instrument as this would have the effect to vest in Fort and Story an absolute title in the property, if it were not positively controlled by the law of Louisiana. We must administer the law as it is; and having established *that the original transaction* was an antichresis, and continued so up to the 2d of June, it was not in the power of the parties to give it such a character, as to vest by the act of Livingston an absolute title in Fort and Story.

" 'In the language of the Code, 1808, tit. Pledge, art. 28 already cited, the creditor

·does not become proprietor of the pledged immovables, by failure of payment at the stated time, any clause to the contrary is null:' 'and in this case it is only lawful for him to sue his debtor, before the court, in order to obtain sentence against him, and to cause the objects which have been put into his hands,· in pledge, to be seized and · sold.' If such a clause had been inserted *in the ·original agreement,* it would have been *void.* Can it be more valid, because *subsequently* introduced in a paper having a direct relation to the *first contract;* and which was intended *to alter its character* in to something which *the law prohibits,* when it determines *the original contract to be one of pledge?* We think not. Such an allowance to a creditor would be a precedent, giving to all creditors in cases of pledge *the power to defeat the benevolent vigilance of the law,* preventing them from becoming proprietors of the debtor's property, unless by a decree of the court. We think it immaterial whether *such covenant be in the original agreement, or in a subsequent instrument. In either case the law is express; the creditor does not become the proprietor by the failure of the debtor to pay; .any clause to the contrary is ·null."* (Italics ours.)

(13) The demand of defendants for the reformation .of the act of February 14, 1923, by eliminating the "security" clause and thereby making the act a cash sale, is met in this case by a plea of prescription of 10 years liberandi causa under Article 3544 of the Revised Civil Code. This article provides that:

"In general, all personal actions, except *those before enumerated,* are prescribed by ten years."

In Louisiana Oil Refining Corporation et al. v. Gandy et al., 168 La. 37, 121 So. 183, this Court held (page 186):

"In our view an action to reform a deed is a personal action", and that the· prescription of ten years liberandi causa pleaded under Article 3544 of the Revised Civil Code is applicable.

As to the time when prescription begins to run the Court said: "It will not begin to run until the facts which constitute the fraud *or mistake which is the ground for the reformation are discovered* or, at any rate, until the time when, by use of due diligence, they ought to have been discovered by the party applying for relief or his . privy."

"The Notary before whom the Act of February 14, 1923, was passed testified that, after the deed was executed, the question arose between Acosta and Harang, the contracting parties, as to the payment of the Revenue Stamps, and that he, the Notary, settled the matter, then and there, by stating that he could legally insert in the act the clause: "This sale is made *to secure a debt on said described property and that no revenue stamps are to be attached hereto."*

The answer of defendants, in which they pray for the reformation of the deed, was filed in the lower court on March 27, 1937, or 14 years after Harang knew of the existence of this alleged mistake, and

his heirs, as his privies, are bound by this knowledge.

The plea of prescription of 10 years liberandi causa under Article 3544 of the Revised Civil Code is therefore sustained.

■ (14) The plea of estoppel filed by defendants is without merit, for the widow and heirs of Acosta have pleaded the nullity of the instrument of October 30, 1936, as being in violation of a prohibitory law, in fraud of their rights, and without consideration.

In the case of Kelly v. Kelly, 131 La. 1024, 60 So. 671, this Court said:

"The doctrine of estoppel has no application to conventions which derogate from the force of laws made for the preservation of public order or good morals, and what is done in contravention of a prohibitory law is void, although the nullity be not formally directed." Citing R.C.C. Arts. 11 and 12.

And certainly there can be no estoppel which is attacked, as is the instrument in the present case.

(15) On January 30, 1937, the widow in community and heirs of Olivanne Acosta sold to James J. Tracy an undivided one-half interest in the property. This deed was duly recorded in the Parish of Lafourche February 1st, 1937, prior to the deed to defendants by plaintiffs of the property in question, of date October 30, 1936, which was not recorded until February 12, 1937.

■ The effect of act of February 14, 1923 being one of antichresis, and there be-ing nothing of record contradicting its terms at the time of the registering of the act from plaintiffs to James J. Tracy, he acquired, as a third person purchasing upon the faith of the public records, a valid title to the interest in the property conveyed to him by plaintiffs. McDuffie v. Walker, 125 La. 152, 51 So. 100.

■ It is set out in the deed to Tracy that the plaintiffs "are the owners in indivision of the following described property situated in the Parish of Lafourche towit: * * *". It then provides that: "And Whereas, the said Mrs. Dominique Harang and the heirs of Dominique Harang and four (4) others are claiming the ownership of the aforesaid property with all of its mineral resources and it is necessary that the said parties of the first part should take legal action against said claimants, or any of them, or their assignees, vendees, or any other claimants in order to have vindicated the rights of ownership of said parties of the first part to said property."

The consideration for the sale is then expressed in the following language:

"And the said parties declare that this transfer is made in consideration of the professional services rendered by the said James J. Tracy, and to be rendered by him in bringing whatever action or actions he may deem necessary or proper in order to secure judgment in favor of said parties of the first part against any and all adverse claimants of said property and in vindication of the rights of the parties of the first part, and in further consideration of the said James J. Tracy paying whatever court costs, charges, expenses, etc. may be nec-

essary in any suit or suits, claim or claims, etc."

"And the said parties further declare that the said James J. Tracy shall have the exclusive power and authority to bring any suit for the vindication of the rights of the said parties of the first part and to compromise such suit or suits, claim or claims, in any court or elsewhere, and to compromise any matter out of Court, and to represent said parties of the first part in any action or actions the said James J. Tracy may see fit to institute."

"It being further understood and agreed to by the parties of the first part that they shall not have the right, without the written consent of the party of the second part, to settle, compromise, release, discontinue, or otherwise dispose of such suit or suits, claim or claims, etc. It being further understood and agreed to by and between all of the parties hereto, that this power of attorney, being coupled with an interest, is irrevocable."

In the case of McClung et al. v. Atlas Oil Company et al., 148 La. 674, 87 So. 515, there was before the Court a contract by authentic act, by which McClung sold to Huey P. Long an interest in certain property, the consideration in the deed being quite similar to that in the deed from plaintiffs to Tracy. McClung, who was a co-plaintiff with Long, adjusted his own differences, and the question was raised whether notice of the sale from McClung to Long, which set out the employment should not have been served as provided by Act 124 of 1906.

This Court said in that case (page 518):

"As we read the contract, it was not alone a transfer of an interest in the subject-matter of the contemplated lawsuit, but it was a present conveyance of a fixed undivided interest in such title as McClung then owned in the mineral rights of the property described. The consideration was a real one, i. e., the professional services to be rendered, and when the act was recorded in the conveyance records McClung could not thereafter have sold to any one else the rights in question so as to give them a claim superior to Long's any more than he could have done in any other conveyance of real property. If Long acquired a title in the property, then he undoubtedly had a standing in court to test the same with others making claim to the same thing. He has a real interest to assert. C.P. art. 15."

It is apparent, therefore, that Tracy has the same right in the present case.

Tracy did not acquire a litigious right by the conveyance to him of his interest in the property by plaintiffs, as there was no suit pending at the time.

As said by this Court in the McClung Case:

"Leaving out of consideration for the present Act No. 124 of 1906, we will inquire whether or not the interest which Long acquired involved a litigious right within the meaning of the law. . As was said by us in Sanders v. Ditch, 110 La. [884], 899, 34 So. 860 (decided before act of 1906 was passed), there is nothing wrong or immoral in the act itself of conveying

a right which is either in the process of litigation or may become litigated, and its illegality arises when and to the extent only which the express law makes it such. In that case, we took occasion to review the codal provisions and jurisprudence on the subject up to that time, and to point out that the Code itself (article 2653) in unequivocal terms defines a litigious right as one about which a suit exists. Until there is a lawsuit actually pending, no right is litigious, no matter how apparently necessary one may be to enforce it. And the term has the same meaning in article 2447, applying to attorneys and court officers, as under article 2652, applying to all other persons, the only difference being that in cases where the first article applies the attempted transfer is null, while under the latter the party against whom the litigious right exists may relieve himself by paying to the purchaser 'the real price of the transfer, together with the interest from date.' In the present case, there was no suit pending when Long acquired his interest in the mineral rights; and, while it is true that the consideration which he agreed to give was his professional services in such actions as he might deem necessary to obtain judgment in favor of McClung therefor, yet, even this could not have the effect of supplying the condition which the Code requires, i. e., the pending of a suit. Sanders v. Ditch, supra; Succession of Landry, 116 La. 970, 41 So. 226; Saint v. Martel, 122 La. 93, 47 So. 413."

Our conclusion is that James J. Tracy, one of the plaintiffs in this suit, has a legal and valid undivided one-half interest in the

property involved in this litigation. Being a third person, purchasing upon the faith of the public records, showing that the recorded Act of February 14, 1923 was an antichresis, it is manifest that this act cannot be reformed in this case, so far as Tracy is concerned, by eliminating the "security clause" from the act and thereby converting it into a cash sale.

(16) The instrument of October 30, 1936, purports to be a quit-claim deed executed by plaintiffs to defendants, without one cent of consideration, when the property in dispute in this case is alleged to be of the value of $250,000.

Plaintiffs allege that this instrument was procured from them by Warren J. Harang, one of the defendants, and his attorney, and state in paragraph XXIX of the petition: That they "deliberately and purposely withheld the real intent and purpose of said instrument of October 30, 1936, suppressed the truth from and falsely represented matters and things to petitioners, solely for the purpose of defrauding petitioners of their valuable property rights."

The plaintiffs have little or no education. Four of the plaintiffs could not read or write and made their marks to the instrument of October 30, 1936. These plaintiffs are Mrs. Emma Gautreaux Acosta, surviving widow in community of Olivanne Acosta; Mrs. Octavie Acosta Parr; Mrs. Valerie Acosta LeBlanc; and Mrs. Linda Schouest, heirs of Olivanne Acosta. T. 17 and 18. Plaintiffs have had no experience in business transactions. They are all humble French citizens of the State. They were not present when the Act of February 14,

1923, was passed. They knew nothing about it creating an antichresis. They were ignorant of the rights of Olivanne Acosta under the act. They did not know that the title in the property vested in him and remained in him during his lifetime and was transmitted to plaintiffs as his widow and heirs. They signed the instrument of October 30, 1936 before they had consulted any attorney as to their legal rights. Neither of the agents of defendant explained to them their legal rights under the antichresis. These agents did not inform plaintiffs that they would be divested by the signing of the instrument of October 30, 1936 of any property rights. They did not advise plaintiffs that the elimination of the security clause from the Act of Antichresis would strip them of their title to the property and would create an act of cash sale, vesting an absolute title in Dominique Harang, as vendee.

On the contrary, the agents of defendants, as testified to by plaintiffs, represented to them that they merely wanted plaintiffs to correct *a little error* in the act of February 14, 1923, as to the word "security", which A. L. Deramee, Notary, had inserted into the act, while he was *under the influence of liquor, or had been drinking too much*. This statement was utterly false. There is not one jot or tittle of evidence in the record to show that A. L. Deramee, the Notary, had been drinking at all when the "security clause" was written into the contract of antichresis.

This statement was made to plaintiffs by the agents of defendant for no other purpose than to impress plaintiffs with the idea that this was a trivial error, of no importance whatever, and had no proper place in the act. This was also a grave falsity.

These agents were very careful to ask plaintiffs if their father had turned the property back to Harang because he could not pay for it. The plaintiffs answered that they so understood, but that Harang had agreed to let their father take back the property at any time he was able to pay the debt.

This question, without doubt, was asked plaintiffs by the agents of defendants to impress plaintiffs with the idea that they had no right or title to, or interest in, this property.

The attorney for defendant, Warren J. Harang, however, well knew, at the time, that Acosta was prohibited by law from delivering the property to Harang, creditor and pledgee, because of Acosta's failure to pay the debt when it fell due. The Attorney for Warren J. Harang, one of the defendants, further knew, at the time, that Harang, the creditor and pledgee, was prohibited by law from receiving this property in payment of the debt; and that the *only lawful way* in which Harang could obtain a legal and valid title to the property, was to sue Acosta, the debtor and pledgor, obtain a judicial sentence against him, and have the pledged immovable seized and sold, and buy it in at the sale. R.C.C. Art. 3179.

The false statements made to plaintiffs by the agents of defendants, and their suppression of the truth as to the legal rights of plaintiffs under the

Act of Antichresis, and their concealment as to the real purpose of the instrument, constitute, in our opinion, such fraud and deception as to strike with nullity the instrument of October 30, 1936.

The plaintiffs all testify that they would not have signed this instrument had they been advised, or had they known, that their property rights were being divested thereby.

The testimony of Warren Harang, one of the defendants, shows that this property was rented to Abel LeBlanc for the year 1923, the same year the antichresis was created. The date of the antichresis is February 14, 1923. It further shows that Dominique Harang, the father of defendant, died in about six months afterwards; that his last will was probated; that the Hibernia Bank & Trust Company of New Orleans was named executor; that the Bank had possession of this and other property belonging to the Estate of Dominique Harang and administered the same for 10 years, before the heirs were placed in possession in the year 1933.

The testimony of Warren Harang also shows that the pledged property was cultivated in cane, corn, etc., in 1923, 1924, 1925, 1926, 1927, 1928, 1929, 1930, 1931, 1932, 1933, 1934, 1935 and 1936; and, beginning with 1927, "the new variety cane" was used in planting this place.

Yet this witness would have this Court believe that only enough cane was produced on this 60 acre tract during each of these fourteen years "to pay the taxes" each year, and that he barely eked out a

living. We do not find it possible to accept such testimony.

Warren Harang is one of the defendants, and a son of Dominique Harang, who died at the age of 76 years. Defendant testified that for a number of years before the death of his father, he managed for him several sugar plantations, *but that no separate account was kept as to the indebtedness of the 60 acre tract in dispute, and that his father kept no such account* during his life time.

Considering the fact that defendant testified that his father was a good business man and was careful in his business transactions, this is a most remarkable statement.

Not a single account in Globo was offered in evidence to corroborate the testimony of this witness, for a single year between 1923, when the Act of Antichresis was entered into between Acosta and Harang, and the year 1936, the last year in which the witness testified that a crop of cane was raised on this property.

It is incredible that any sugar planter operating each year several sugar plantations would keep his accounts in such a loose manner or not to be able to show the expense of operation, the losses, the profits, or the indebtedness of each plantation which he owned and operated each year. Such testimony has been designedly given, in our opinion, by this witness, who is the principal in the fraudulent attempt to procure the quit-claim deed for defendants in this case.

The purpose of this testimony is, without doubt, to debar plaintiffs from taking possession of this property by proof of the discharge of the debt for which the antichresis was given as security in this case.

Article 3168 of the Revised Civil Code declares that:

"The fruits of the pledge are deemed to make a part of it, and therefore they remain, like the pledge, in the hands of the creditor; *but he can not appropriate them to his own use; he is bound, on the contrary, to give an account of them to the debtor, or to deduct them from what may be due to him."*

Defendants have neither given an account to the plaintiffs, the heirs of the debtor, nor have they deducted the fruits of the pledge from what may be due them.

Under the facts and circumstances of this particular case, we feel fully justified in presuming that the rents and revenues received from this property during fourteen years by defendants, the heirs of the pledgee, have been sufficient to discharge the principal and interest of the debt secured by the pledge of the immovable, and in holding that plaintiffs are the true and lawful owners, and are entitled to the possession of the pledged immovable, free of the pledge and antichresis.

It would be the very height of injustice in this case to hold, with the state of facts before us, that although plaintiffs are the true and lawful owners of this property, yet they are to be perpetually debarred from possession of same, because of the violation of their legal duty by defendants to account to plaintiffs for the rents and revenues, or to deduct them from the interest and principal of the debt.

Defendants cannot be permitted in this case to profit by the violation of their legal duty to plaintiffs, and by their laches to deprive plaintiffs of their right to the possession of the immovable in dispute. To hold otherwise would be, in effect, to vest the title to this property in the heirs of the pledgee, in violation of a prohibitory law of this State.   R.C.C. Art. 3179.

In the lower court, judgment was rendered in favor of defendants, rejecting the demands of plaintiffs and dismissing plaintiffs' suit at their costs.   From this judgment plaintiffs have appealed.

For the reasons assigned, the judgment appealed from is annulled and reversed.

It is now ordered, adjudged and decreed that there be judgment in favor of plaintiffs, Mrs. Emma Gautreaux, widow in community of Olivanne Acosta; Mrs. Octavie Acosta, wife of Paul Parr; Mrs. Ida Acosta, wife of Albert Trosclair; Mrs. Valerie Acosta, wife of Abel LeBlanc; Mrs. Bella Acosta, wife of Alcest Savoie; Mrs. Linda Acosta, wife of Fred Schouest; Mrs. Helen Acosta, wife of Joseph Chimenta; Lonia Acosta; Abel Acosta, heirs of Olivanne Acosta; and in favor of James J. Tracy, and against defendants, Mrs. Emelie Hebert, widow in community of Dominique Harang; Mrs. Alice May Harang, wife of Dr. Joseph S. He-

bert; Edmund Louis Harang; Stella E. Harang, wife of Thomas W. Collins; and, Warren J. Harang, the heirs of Dominique Harang, decreeing act of February 14, 1923, passed before A. L. Deramee, Notary Public, for the Parish of Lafourche, La., and recorded February 16, 1923, in Conveyance Book No. 54, folio 137, Entry No. 8016, of said Parish, to be an Act of Antichresis; and decreeing the instrument of October 30, 1936, signed by plaintiffs, the widow in community and the heirs of Olivanne Acosta, and recorded in Conveyance Book No. 79, folio 478, Entry No. 34051 in the Parish of Lafourche, La., to be null and void, and ordering the inscription of same erased from the records of the Parish of Lafourche, La.

It is further ordered, adjudged and decreed that there be judgment in favor of petitioners and against defendants decreeing petitioners to be the true and lawful owners, in the following proportions: James J. Tracy, an undivided one-half; Mrs. Emma Gautreaux Acosta, an undivided one-fourth; and Mrs. Octavie Acosta, wife of Paul Parr; Mrs. Ida Acosta, wife of Albert Trosclair; Mrs. Valerie Acosta, wife of Abel LeBlanc; Mrs. Bella Acosta, wife of Alcest Savoie; Mrs. Linda Acosta, wife of Fred Schouest; Mrs. Helen Acosta, wife of Joseph Chimenta. Lonia Acosta, and Abel Acosta, an undivided one-thirty-second each, in and to the following described property to-wit:

A certain tract of land, situated in the Parish of Lafourche, State of Louisiana, about twenty-eight miles below the Town of Thibodaux, measuring one and one-half arpents in width on said Bayou Lafourche, by a depth of forty arpents; bounded above by property of Abel Le-Blanc, and below by property of Igniasse Plaisance.

It is further ordered, adjudged and decreed that the possession of above described property be restored to petitioners, free of said pledge and antichresis.

It is further ordered, adjudged, and decreed that the right of petitioners to institute any suit or take any action to which in law or in equity they may be entitled, as against any and all parties claiming any adverse rights to or in said property, or to the minerals thereto belonging, whether said adverse claimants be by contract, sale, lease or otherwise, be reserved; and that defendants pay all costs of this suit.

O'NIELL, C. J., having been absent during the argument, does not take part.

ODOM, J., dissents.

PONDER, J., dissents and hands down reasons.

PONDER, Justice (dissenting).

In this suit the plaintiffs seek to have a certain instrument declared an antichresis.

On January 9, 1920, Olivanne Acosta acquired by deed from Dominique Harang a certain tract of land on Bayou Lafourche in the Parish of Lafourche. The consideration called for in the deed was $5,250

of which amount $1,500 was paid in cash and the balance of $3,750 was represented in five promissory notes bearing 8% per annum interest from date until paid secured by a vendor's lien and mortgage on the property. The notes were made payable to the order of Dominique Harang as follows: The first note calling for $700 was payable one year after date, the second note calling for $750 was payable two years after date, the third note calling for $750 was payable three years after date, the fourth note calling for $750 was payable four years after date, and the fifth note calling for $800 was payable five years after date. There was no payment made on the principal of these notes and the interest was only paid up to January 1, 1921. There was no other payments made either on the principal or interest of these notes after that date. On February 14, 1923, Olivanne Acosta executed a cash deed transferring this same property back to Dominique Harang for the price and consideration of $3,750 cash. The deed was in the form of a regular cash deed except we find a paragraph containing this statement, "Appearers hereby declare by these presents that this sale and transfer is made to secure a debt on said described property, and that no revenue stamps are to be attached hereto." On June 13, 1923, within four months after this last transfer was made, the five notes representing the balance of the purchase price in the first transfer of this property from Dominique Harang to Olivanne Acosta of date January 9, 1920, were cancelled and the mortgage was cancelled from the mortgage records. On October 30, 1936, the widow

and children of Olivanne Acosta, now deceased, executed an acknowledgment to the effect that the deed from Olivanne Acosta to Dominique Harang of February 14, 1923, was an actual sale and transfer and that at no time was it intended to secure a debt and in the same instrument the widow and heirs of Olivanne Acosta declared that they had no interest in the property and declared that if they have any interest in the property they quit claim such interest. This instrument was filed and recorded on February 12, 1937, in the conveyance records of Lafourche Parish. On January 30, 1937, the widow and children of Olivanne Acosta transferred an undivided one-half interest in this same property to James J. Tracy, an attorney, in consideration of professional services rendered and to be rendered to the end of securing judgment against all adverse claimants to the property and in vindication of the rights of the widow and children of Olivanne Acosta in the property. It was declared in this instrument that this power of attorney being coupled with an interest is irrevocable.

The plaintiffs contended that the deed from Olivanne Acosta to Dominique Harang of February 14, 1923, was an antichresis or the pledge of an immovable and that the fruits and revenues derived from the property was more than sufficient to pay the debt secured by the pledge or antichrises; that James J. Tracy acquired an interest in the property on the faith of the public records; and that the instrument executed by the widow and children of Olivanne Acosta purporting to be an acknowledgment of the sale and quit claim

was in fraud of their rights and in violation of prohibitory laws. The plaintiffs sought to have the deed from Olivanne Acosta to Dominique Harang to be declared an antichresis; sought the annulment of the instrument purporting to be an acknowledgment of sale and quit claim; sought to be declared the owners of the property free from pledge and antichresis; and sought to be placed into possession of the property. The defendants denied that the deed was executed as a pledge to secure a debt and claimed that it was an act of sale. In the alternative the defendants ask that in event the deed was ambiguous on its face that it be reformed by striking out and deleting the following words, viz.: "Appearers hereby declare by these presents that this sale and transfer is made to secure a debt on said described property, and that no revenue stamps are to be attached hereto." The defendants alleged that this clause in the deed was inserted through ignorance, error, mistake and by accident. It was alleged that the notary placed this clause in the deed after he had advised the parties that he could insert a declaration which would obviate the necessity of payment of revenue stamps but that it would not alter the agreement of sale; that the parties signed the instrument under the firm belief that the clause inserted in no way affected the sale.

The plaintiffs interposed a plea of ten years prescription under the provisions of Article 3544 of the Revised Civil Code against the defendants' alternative claim to have the instrument reformed. The defendants interposed a plea of estoppel claiming that the plaintiffs are barred from attacking the deed by their act of acknowledgment of the sale and quit claim. Upon trial the lower court rendered judgment rejecting the plaintiffs' demands. The plaintiffs have appealed.

Upon examination of the written reasons for judgment given by the lower court, we find that the lower court was of the opinion that an antichresis could only be established by written contract and that parol testimony was not admissible to prove an antichresis. The lower court was of the opinion that the instrument on its face did not establish an antichresis. However, there is parol testimony in the record which was taken subject to the objection.

Article 3133, Revised Civil Code, defines pledge as follows: "The pledge is a contract by which one debtor gives something to his creditor as a security for his debt."

Article 3134, R.C.C., provides, "There are two kinds of pledge:

"The pawn.

"The antichresis."

Article 3135, R.C.C., provides, "A thing is said to be pawned when a movable thing is given as security; and the antichresis, when the security given consists in immovables."

Under the general provisions applying to pledge in the Civil Code which applies to both kinds of pledge, the pawn and the antichresis, we find this provision, "Every lawful obligation may be enforced by the auxiliary obligation of pledge." Article 3136.

Article 3176, R.C.C., provides, "The antichresis shall be reduced to writing. The creditor acquires by this contract the right of reaping the fruits or other revenues of the immovables to him given in pledge, on condition of deducting annually their proceeds from the interest, if any be due him, and afterwards from the principal of his debt."

Article 3152, R.C.C., provides, "It is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right."

It is well settled in this State that an antichresis cannot be proved by parol testimony. The Article of the Code itself provides that the contract must be in writing. The plaintiffs and defendants in this suit concede that the contract of antichresis must be reduced to writing and that we must determine whether or not the instrument is an antichresis from the instrument itself. This is in accordance with the Article of the Civil Code that requires that the contract shall be reduced to writing and the established interpretation of this Article of the Civil Code. There being no dispute on this question there could be no purpose gained in citing the various decisions in support of this doctrine. In order to determine the intent of the parties we will have to ascertain it from the instrument itself. The plaintiffs rely in support of their contention on several cases which we will discuss in order.

In the case of Calderwood v. Calderwood, 23 La.Ann. 658, wherein suit was instituted to compel the retransfer of property which had been sold and a counter letter given, the Court in determining the act of sale and counter letter construed them together. It is to be noted that the counter letter states that it is to explain the true intent and object of the parties to the act of sale. It also recites the specific debt which it is given to secure and provides that it is made to secure and guarantee the payment of that debt. In other words, the contract of pledge recites the nature and extent of the principal obligation. In the case of Livingston v. Story, 11 Pet. 351, 9 L.Ed. 746, there was also a counter letter explaining the nature and extent of the principal obligation. The counter letter made specific reference to the debt which was intended to be secured and to the sale made with the intent to secure the debt. In both of these cases the auxiliary contract of pledge or antichresis specifically states the nature and extent of the principal obligation and specifically refers to the debt intended to be secured. In fact, the transactions were so tied together that the true intent of the parties was clear and certain.

In the case of Ware & Son v. Morris, 23 La.Ann. 665, where there was an act of sale and a counter letter, it was stated to the effect that as between the parties the counter letter is as operative as if its recitals and stipulations had been expressed in the notarial act. We find no fault with this doctrine but it is of no avail to the plaintiffs. It does not con-

tradict the necessity that the nature and extent of the principal obligation must be set out in the antichresis.

In the case of Cater v. Merrell, 14 La.Ann. 375, this Court stated:

"For what is a pledge? It is an auxiliary contract for the enforcement of any lawful obligation. C.C. arts. 3100, 3103. It results from this definition, that there should be no uncertainty or ambiguity as to the nature and extent of the principal obligation, which it is the object of the pledge to aid and enforce.

"Otherwise, it is impossible to ascertain the nature and extent of the rights and obligations of the pledgor and pledgee, reciprocally, from the instrument itself. Recourse would necessarily be had to parol proof, to explain the intention of the parties. And thus the object of the law which requires this contract to be reduced to writing, would be defeated, and the door opened to the perpetration of frauds upon the parties contracting, and upon their creditors."

In a concurring opinion in this case, it is stated:

"Articles 3100, 3102 and 3103 declare, that the pledge is a contract by which one debtor gives something to his creditor as a security for his debt, that a thing is said to be pawned, when a movable thing is given as security, and that every lawful obligation may be enforced by the auxiliary obligation of pledge.

"The meaning then of the declaration in the second section of these Acts, that a pledge may be made by private writing is, that the parties may make a written contract in which it shall be specified that the debtor gives a certain thing which must be mentioned to his creditor, as a security for a debt which must also be specified.

"The object of the law in requiring it to be in writing, is that the whole contract should be manifested.

"If this were not the object, then there would have been no necessity of declaring that the contract of pledge should be in writing."

We find in the case of Martin v. His Creditors, 15 La.Ann. 165, that it is stated:

"Privileges are of strict right; and parties claiming them must conform to the requirements of the law. It is required, in order to create a pledge, not only that delivery should accompany the private deed, but that the instrument itself should exhibit the nature and extent of the rights and obligations of the contracting parties reciprocally."

I am not unaware of the fact that these cases involve the pledge of movables. However, the court was discussing the Articles of pledge that apply to both movables and immovables. Article 3176, R.C. C., provides that the contract of antichresis must be in writing. The contract of pledge is an auxiliary contract for the enforcement of a lawful obligation. From a reading of all the Articles it would appear that the auxiliary contract of pledge would follow the terms and conditions of the principal obligation which it is the object of the pledge to aid and enforce.

The Civil Code provides that if the principal obligation be conditional that the pledge is confirmed or extinguished with it and if the obligation is null the pledge is null. If the nature and extent of the rights and obligation of the pledgor and pledgee is not set forth in the instrument itself it would necessitate parol proof to explain the intention of the parties which would defeat the very purpose requiring the contract to be in writing and the door would be open to fraud.

After carefully examining all the cases cited by the plaintiffs and the other cases decided by this Court touching antichresis I have been unable to find any case that holds to the effect that it is not necessary to state the nature and extent of the principal obligation in the contract of antichresis. We cannot go beyond the instrument and assume that this deed was given to secure any particular debt on the property unless specific reference is made to what debt it was intended to secure or language to that effect. I do not believe that it was ever the intent of the parties to enter into a contract of the nature of an antichresis. In the first place it is an antiquated form of contract and not one used in the ordinary course of affairs. The plaintiffs are seeking to convince us that the parties to this instrument were availing themselves of an antiquated method of securing a debt, an unusual contract and one the average person or average notary knows nothing of and a contract very seldom even in the past resorted to to secure a debt. In the case of Harang v. Ragan, 134 La. 201, 63 So. 875, this Court stated that an antichresis was an antiquated

contract. It would not be reasonable to suppose or assume in the absence of stipulations showing clearly the certain and specific debt that the parties ever intended the instrument in the light that the plaintiffs contend. In view of the fact that a very short time after the property was retransferred the notes and mortgage were cancelled thereby destroying the evidence of the debt in my opinion shows that it was the intent of the parties to retransfer the property and not their intent to create an antichresis or pledge.

The deed from Acosta to Harang is in the form of a regular cash deed with the exception that it states, "Appearers hereby declare by these presents, that this sale and transfer is made to secure a debt on said described property, and that no revenue stamps are to be attached hereto." It recites that the property is transferred for a cash consideration to Dominique Harang, his heirs and assigns forever. Abel LeBlanc, the husband of one of the plaintiffs, a daughter of Olivanne Acosta, was a witness to this deed. The deed was passed before A. L. Deramee, a notary public. The provision in the deed relied on by the plaintiffs appears to have reference to the revenue stamps and why the revenue stamps are not necessary. A careful reading shows that the appearers are giving a reason why the stamps are not necessary. This provision is general in its nature and does not mention the nature of the debt or what debt was intended to be secured. It would be necessary to go beyond the deed to ascertain what debt it was given to secure. If we go beyond the instrument we find that the

promissory notes, and mortgage were cancelled within four months after this retransfer was made. In other words, the notes and mortgage being the evidence of the debt was cancelled. This clearly shows that the parties intended to retransfer the property otherwise they would not have cancelled the evidence of the debt. If they had merely intended to pledge the property to secure the debt, they would not have destroyed the evidence of the debt. We would have to assume that this was the debt that was intended to be secured since the instrument itself makes no specific reference to this particular debt. At the time the retransfer was made Olivanne Acosta owed Dominique Harang the five promissory notes amounting to $3,750 and over two years interest that was past due on the notes. In fact, the interest due on the notes amounted to $675. In other words, Acosta owed $3,750 on the principal and $675 interest making in all $4,425. The consideration in the retransfer is of a similar amount to that called for in the notes without the interest past due. It would be seemingly strange if the parties intended to pledge the property to secure this particular debt that they only pledged the property to secure part of the debt and not the entire debt. If the parties had intended this contract to be one of pledge to secure this particular debt, it would only be reasonable to believe that they would have pledged the immovable to secure the entire debt. Furthermore, the construction placed on this instrument by the plaintiffs does not conform to reason and human experience. If we accepted plaintiffs' contention, Harang

relinquished his vendor's lien, cancelled his mortgage and notes, destroying the evidence of the debt, waived the $675 interest due and accepted in lieu thereof a pledge of the immovable, with the responsibility of managing the immovable, the profits of which would go to the payment of interest and if any excess to the payment of the principal obligation, a security that gave him no priority or preference over the ordinary creditors of Acosta under the provisions of Article 3181, R.C. C., which provides: '

"Every provision, which is contained in the present title with respect to the antichresis, can not prejudice the rights which third persons may have on the immovable, given in pledge by way of antichresis, such as a privilege or mortgage.

"The creditor, who is in possession by way of antichresis can not have any right of preference on the other creditors; but if he has by any other title, some privilege or mortgage lawfully established or preserved thereon, he will come in his rank as any other creditor."

Under the provisions of Article 2236 of the Revised Civil Code an authentic act is full proof of the agreement contained in it between the contracting parties and their heirs or assigns. Parol evidence is not admissible to vary or contradict the stipulations of a written contract. This is so well established it is unnecessary to cite the long list of authorities holding to that effect. Article 2238 of the Civil Code provides to the effect that an act either authentic or under private signature is proof between the parties even of what is

expressed in enunciated terms provided the enunciation has a direct reference to the disposition. Enunciation foreign to the disposition can serve only as a commencement of proof. In this case the disposition is a sale with a provision that does not have direct reference to the sale. The enunciation that appears to be contrary to the sale is foreign to the disposition in which case the door would be open to parol evidence not to vary the terms of the instrument but to render it intelligible. Article 1945 of the Civil Code provides as follows:

"Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

"First—That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;

"Second—That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;

"Third—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

"Fourth—That it is the common intent of the parties—that is, the intention of all —that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract."

Article 1950, R.C.C., provides: "When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms."

Article 1953 of the Revised Civil Code provides: "Whatever is ambiguous is determined according to the usage of the country where the contract is made."

Article 1955, R.C.C., provides: "All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act."

Article 1956, R.C.C., provides: "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."

The provision in the deed to the effect that the sale is made to secure a debt on the property would render the instrument ambiguous and resort must necessarily be had to parol evidence, not to contradict the instrument but to render it intelligible. Rester v. Powell, 120 La. 406, 45 So. 372; Interstate Trust & Banking Co. v. Liquidators, 143 La. 574, 78 So. 968. In the instrument in this case all the provisions except one paragraph show that it is an act of sale. The contradictory paragraph states that the sale is given to secure a debt and no stamps are necessary. If we were to accept the plaintiffs' contention, the instrument would not be a sale but a pledge to secure a debt. In view of the Articles of the Civil Code above cited you could not give effect to every stipulation

in the agreement as contended by the plaintiffs because they would be contradictory. The instrument is either a pledge or a sale. It would appear that if you give sense to the entire act that the instrument is a sale. The instrument being ambiguous if determined according to the usage of the country where the contract was made it would be a sale for the reason that even though our law provides for the pledge of an immovable to secure a debt yet under the general usage it has only been resorted to in a very limited number of instances. The usual mode of securing a debt with an immovable is by mortgage. If we were to construe this instrument as being doubtful the construction put on it by the parties to the contract and their heirs show that they never recognized it except as an act of sale. All of the plaintiffs except Tracy stated in their testimony that the first information they received that they had any interest in the property was given them by Tracy after they had signed the acknowledgment and quit claim. Abel LeBlanc, the husband of one of the plaintiffs who signed the transfer from Acosta to Harang, the contested instrument, also was present and signed as a witness when his wife signed the acknowledgment and quit claim. The record shows that he was present in court and did not take the stand and testify. The only parties on behalf of the plaintiffs who testified that the acknowledgment and quit claim was obtained by fraud were the plaintiffs themselves, except Tracy. The plaintiffs did not put on the stand the several witnesses to their signing of the acknowledgment and quit claim who were relatives of theirs to prove that the instrument was secured by fraud. The plaintiffs testified to the effect that the instrument was not properly explained to them before they signed it but did testify that the instrument was read to them. The evidence shows that the various plaintiffs except Tracy signed this instrument in different places and not at the same place. The evidence shows that the majority of the children of Olivanne Acosta were married women and that they signed in the presence of their husbands. Some of the husbands of plaintiffs signed as witnesses but did not testify in this case. All the plaintiffs except Tracy signed the acknowledgment willingly and without protest or objection. The plaintiffs testified to the effect that they were misled in signing the instrument by the representation that it was to correct a little error wherein the word "security" had been inserted in the deed by the notary while he was under the influence of liquor or had been drinking too much. A. L. Deramee, an attorney who drew up the act testified to the effect that he drew it up at the instance of another firm of attorneys and that he and one of the defendants went to the various plaintiffs except Tracy and read and explained the contents of the act to them. They asked the plaintiffs if it was their understanding that the property was deeded back to Harang or merely transferred to secure a debt. Having received the answer to the effect that it was to settle or cancel the debt and not to secure the debt the instrument was read and explained to each of the plaintiffs after which the plaintiffs signed it. The witness testified that it was explained to each and every one of

the plaintiffs before they signed it. One of the defendants corroborates this testimony. Under the evidence this would not constitute a fraud that would vitiate the instrument. Furthermore, Abel LeBlanc, who signed the act of retransfer as a witness was present when his wife, one of the plaintiffs, signed the acknowledgment and acquiesced in his wife's signing it and he himself signed it as a witness. This corroborates the defendants' evidence. Edmond L. Deramee testified that at the time that Abel LeBlanc signed the acknowledgment as a witness that LeBlanc stated that he and others had purchased land from Dominique Harang which they also retransferred to Dominique Harang along about the same time for the reason that they were unable to pay for it on account of conditions being so bad. The witness testified that LeBlanc stated to him at that time that he remembered when Acosta retransferred the land back to Harang and that it was retransferred in the same manner which he, LeBlanc, had retransferred his property to cancel the debt. The record shows that Abel LeBlanc was present in court and did not take the stand and contradict this testimony. The plaintiffs having failed to place Abel LeBlanc on the stand to contradict this witness creates the presumption that had LeBlanc testified the testimony would have been against them. Rubenstein v. Files, 146 La. 727, 84 So. 33. The testimony that conditions were so bad that Acosta was unable to pay for the property is corroborated by the notes themselves because no payments either on the principal or interest had been made for more than two years at that time. A. L. Deramee, the notary before whom the contested deed was passed, testified that it was his error in placing the word "security" in the deed. He testified to the effect that the parties had signified that they wanted to pass a cash deed retransferring the property back to Dominique Harang for the consideration of the principal of the unpaid purchase price and owing to the fact that there was no cash disbursement the witness told Dominique Harang that he could insert a clause that would relieve them of placing stamps on the deed. The witness testified at that time he was rather inexperienced as a notary and inserted by mistake the words "to secure a debt" instead of "to pay a debt". The evidence shows that there were no transactions between Olivanne Acosta and his heirs on the one side and Dominique Harang and his heirs on the other side after this retransfer was made of an accounting or settlement of any of the revenues produced from this property. If it had been the intention of the parties that the revenues were to be used to pay the interest and the excess applied on the principal of the debt, there certainly would during this long period of time have been some demand made for an accounting or an account kept to that end. The evidence shows that no such account was kept and that no demand for an accounting was ever made. This corroborates the defendants' testimony and also shows that the parties themselves construed the instrument to be a deed and not a contract of pledge. When the widow and all of the heirs of Acosta signed the acknowledgment at different places with-

out objection, some of whom having signed in the presence of their husbands who also raised no objection, shows that the plaintiffs themselves by their own acts construed the instrument to be a deed. Furthermore, all the plaintiffs except Tracy testified that the first knowledge that they had any interest in this property was transmitted to them by Tracy after they had signed the acknowledgment and quit claim. This shows that they construed the instrument to be a deed and they had recognized it as such. Moreover, the contract of employment entered into by the widow and heirs of Acosta is one that is usually resorted to where the parties themselves are doubtful of the enterprise. In this contract the widow and heirs transfer one half of whatever interest they might have in this valuable property to Tracy in consideration of services rendered and to be rendered to the effect of regaining the title to the property and Tracy paying whatever cost or expense that might be incurred. The widow and heirs by this contract make no risk yet on the other hand if the title is regained Tracy is to receive one half interest in the property which the plaintiffs allege to be worth more than Two Hundred and Fifty Thousand Dollars.

The case of Rester v. Powell, supra, is similar in principle to this one. There was a stipulation in the act of sale, to wit: " * * * are attached to, and form part of, said realty, by destination, and being a fixture thereon, shall not be removed therefrom during the tenure of this mortgage." The court held to the effect that the instrument was ambiguous and that

parol evidence was admissible not to vary the terms of the instrument but to render it intelligible. Furthermore, the parol testimony would be admissible under the allegation of error in the defendants' alternative claim. Armstrong v. Armstrong, 36 La.Ann. 549; Adeline Sugar Factory Co. v. Evangeline Oil Co., 121 La. 961, 46 So. 935.

I am of the opinion that the judgment of the lower court was correct in rejecting the demands of the plaintiffs to have the instrument declared a contract of pledge or antichresis.

Having arrived at this conclusion it is unnecessary to pass upon the other issues presented.

For the reasons assigned, I respectfully dissent.

On Application for Rehearing.

PER CURIAM.

We have studied the lengthy application for a rehearing and the briefs in support thereof, and have carefully reviewed the entire record and the briefs filed herein.

The basis of the defendants' contention, which was adopted by the district court in holding that the instrument was not an antichresis, was that the essential element of a specific debt was not recited in the act. Language was used therein which sufficiently indicated that the debt sought to be secured was one on the "within described property". It appears from the record, all in writing, that the indebtedness of Acosta to Harang, evidenced by the mortgage notes and the recorded

mortgage was the only debt existing between the parties and referred to by them in the act. If an unrecorded counter letter between the parties can be legally considered by the court in connection with a recorded strictly cash act of sale, in order to determine whether or not the intention of the parties was to execute a cash act of sale or an act of antichresis, then we can see no reason, legally or logically, why a recorded and referred to mortgage in the act or instrument creating either an act of sale or an antichresis cannot be likewise considered by the court in arriving at its conclusion as to which of the two the parties intended to execute. When the parties refer to the recorded act of mortgage in the instrument they identify the pre-existing debt sought to be secured and it would have been useless to again recite in the instrument the details concerning the debt i. e., the amount, the rate of interest and maturity date, as all of these were expressly and clearly stated in writing in the authentic act of mortgage, which was recorded. Therefore, the alleged lack of an essential element of an antichresis as authorized by the Civil Code, i. e., the nature of a definite debt, rate of interest and maturity, was clearly present and, as it was expressed in writing, satisfied the requirements of the Code. The defendants' attorney had no trouble in figuring to the penny the amount claimed under the mortgage, as will appear hereafter.

Our learned brother below states in his reasons for judgment in holding that the instrument did not create an antichresis, that he was considering only the instrument itself with no reference whatever to the recorded and referred to mortgage. If he had construed the instrument in connection with the act of mortgage as he concedes the law required him to do with reference to an unrecorded counter letter, then the said missing essential element, i. e., a specific debt, would have appeared and he would have been forced to conclude that the instrument created an antichresis.

The construction sought by the defendants and adopted by the trial court requires the deletion from the instrument of a paragraph that had definite legal significance under the Articles of the Code on the subject of antichresis. The position of the plaintiffs requires that the court give effect to that paragraph. The parties used the form of a cash act of sale but expressly in the act itself legally classified the transfer and conveyance as an antichresis and not a sale by using the language contained in the contested paragraph, which had the effect of limiting or modifying the usual result of parties signing a cash form of sale without any such restrictive or qualifying clauses. It appears to us that this is a stronger and clearer way to establish an antichresis than by mere unrecorded counter letter for the reason that the entire transaction is contained in one document and that instrument placed of public record so that all parties dealing with the title to the property are placed upon notice.

The law-writers and the courts recognize the danger of reforming an authentic act on the ground of alleged errors or mistakes by requiring definite and clear proof thereof. It would certainly be doing violence to this rule to hold that, the testi-

mony of a notary public (who admits that there was nothing about the transaction to especially make him remember it) was sufficient proof of the alleged error, particularly when both parties to the instrument were deceased. Such a rule would invite fraud and surely place the valuable rights of land owners to their property in the hands of the notary, who passed the act of sale or instrument affecting their property.

The notary testified that he had drawn and executed authentic acts affecting immovable property for Mr. Harang on a number of occasions; that in this instance, Mr. Harang called him by telephone and requested him to come to his home for the purpose of passing some acts; that he took his typewriter and the necessary paraphernalia and went to Mr. Harang's home where, upon his instructions, he drafted the acts, including the one in contest; that Mr. Harang told him to prepare a cash act of sale by Mr. Acosta to himself for $3,750; that when Mr. Acosta arrived, he explained the transaction in English and French, because Mr. Acosta was an illiterate man; that Mr. Acosta stated he was turning the property back to Mr. Harang, because he was unable to pay the balance due thereon, and that the clause in question was inserted for the purpose of avoiding payment of Federal Internal Revenue stamps.

The witnesses for the plaintiffs stated that the conveyance or transfer was made by Acosta to Harang because he was unable to pay the balance he owed Mr. Harang on the purchase price of the property, but that Mr. Acosta could get the property back upon paying the balance due.

The form of the instrument in question is that of a cash act of sale and the paragraph in contest is, to say the least, highly indicative of an act of antichresis.

■■■ Therefore, with reference to the alleged error, if Mr. Harang had in mind a cash act of sale and Mr. Acosta an act of antichresis—there was no meeting of the minds of the parties—with the result that their mistakes nullified the attempted transaction, as evidenced by the instrument. This would leave the parties status quo with Mr. Acosta as the owner of the title to the property and Mr. Harang a mortgage creditor. Both parties being dead, their heirs would inherit their respective rights. So that, even from this point of view, the plaintiffs would still be entitled to recover.

Counsel for defendants in their brief in support of the application for rehearing have stressed the argument that the document was either a cash act of sale or a dation en paiment. No where in the defendants' answer or in the testimony of their witnesses do we find that they stated that it was such an instrument. In fact, the notary who passed the act specifically stated, as a witness for defendants, that Mr. Harang never said anything about a dation en paiment.

With reference to the argument that the representative of the Harangs secured the act of correction of 1936 in good faith, it is sufficient to say, conceding that he did act in the utmost good faith, in concluding that the words "to secure" had been erroneously inserted in the instrument instead of the

words "to pay" and that it was, therefore, an act of sale and not an act of antichresis, nevertheless, according to his own statements, he did not make a full disclosure of all of the facts to the plaintiffs but only those that were favorable to his clients and in accord with his interpretation of the instrument. There can be no doubt, whether the defendants' representative acted in good or bad faith, the plaintiffs were misled by his statements and acted upon them in signing the alleged act of correction of 1936.

Mr. Warren Harang, one of the defendants, stated that he received his college training at Sewanee University and had had extensive business experience, but that since the matter was involved and he did not fully understand it, he deemed it necessary to refer it to his attorney, who drafted the necessary act of correction, and he then accompanied his attorney and the representative of the Harang mineral lessees to get the parties to sign the document. These plaintiffs were contacted in their respective places of occupation, the farmer in the field, the dairyman in his dairy and the housewife in her kitchen, etc., —where the Harang representative explained the matter from their point of view only, and secured the signatures of the plaintiffs, four of whom were illiterate and had to affix their marks to the document instead of their signatures. Whether Harang and his representative acted in good faith is of no consequence, because their actions unquestionably deceived the Acosta heirs into believing that they had no rights in the property, and influenced them to sign

the document without any consideration whatsoever.

With reference to the question of an accounting, this Court, having reached the conclusion that the parties established an act of antichresis, it was the duty of the Harangs to render an accounting. They conceded that they had had full benefit of the property for fourteen years and had received all of the fruits and revenues from it during that time but kept no account thereof. It, therefore, appears to us that the plaintiffs, through the defendants' admissions, established a prima facie case of payment of the debt, and it was incumbent upon the defendants, particularly as the law places upon them the duty of keeping an account of the fruits and revenues derived from the property, to rebut the plaintiffs' prima facie case. When Warren Harang, who appeared to be in charge of the property, stated he was unable to give any reliable or accurate information concerning the proceeds and revenues of the property during that period of time, because there were no records or accounts kept, the defendants failed to rebut the prima facie case made out by the plaintiffs.

Even on the rehearing, counsel for the Harangs have not requested the Court to remand the case for the purpose of having an accounting rendered. The testimony of Warren Harang that there are no such records is evidently correct and no useful purpose could be served by remanding the case to the lower court for an accounting proceeding. This is particularly true where the plaintiffs have no knowledge of these matters and some of them were too

young to know anything about the transfer at the time it was made.

Counsel for the defendants suggest in their brief that the sum of $3,750, with 8% interest from February 14, 1922 to date of judgment, or $7,558, due under the vendors' lien of 1920 should be paid by the Acostas to the Harangs. This would be a manifest injustice to the Acostas, when no attempt was made by the Harangs to render an accounting, although the issue was raised in the plaintiffs' petition and an accounting was requested by them during the trial. Surely, defendants' neglect cannot redound to their favor.

Counsel in the brief in support of the application for rehearing here raise, for the first time, the question that their clients were deprived of their property without due process of law, in violation of the State and Federal Constitutions, U.S. C.A.Const. Amend. 14; Const.La.1921, art. 1, § 2. No where in the defendants' pleadings or in the application for rehearing was this issue heretofore raised. After the

statutory delay for rehearing had expired, we granted counsel additional time within which to file a brief in support of his application for rehearing but this does not give him the right to raise issues therein that had not heretofore been made in his application for rehearing. This Court is powerless to grant a litigant additional time to apply for a rehearing and to allow a party to supplement the grounds for a rehearing in a brief filed after the statutory delay for rehearing had expired, would be equivalent to granting additional time in which to file the application for a rehearing. We, therefore, decline to pass upon the question of due process of law, because it comes too late.

The application for a rehearing is denied.

O'NIELL, C. J., does not take part.

PONDER, J., dissents.

ODOM, J., absent.